Henry *v.* Janes.

5-78                                        257 S. W. 2d 285

Opinion delivered April 27, 1953.

*Bob Bailey* and *Bob Bailey, Jr.,* for appellant.

*Robt. J. White,* for appellee.

J. Seaborn Holt, J.   This case involves the custody of Julia Gene Janes, a little girl, eight years of age. Appellee is its father and appellants, its great-uncle and aunt, respectively.   The child's mother, Nina Gene, married appellee November 7, 1940, and this child was born July 18, 1944.   At the time of their marriage, both parties were living in Atkins.   She was a school teacher and he a barber.   Prior to June 15, 1951, they were separated and on June 28, 1951, Nina Gene obtained a divorce from appellee.   A property settlement was made and she was

given the custody of the little girl. The decree provided: "It was further agreed by and between the plaintiff and defendant in making settlement subject to the approval of the court that the plaintiff shall have the care and custody of the infant daughter, Julia Gene, and to keep said child at the home of Mr. and Mrs. Wade Henry at Atkins, Arkansas, who are suitable persons and that they have helped plaintiff and defendant in taking care of said child all these years; that said care and custody by plaintiff is subject to the right of defendant to visit said child at all reasonable times."

Nina Gene Janes died April 26, 1952, and some three months later, appellee re-married and is now living in Little Rock in an upstairs apartment. His present wife had been divorced and has a twenty-one-year-old son.

The present suit was filed by appellants May 21, 1952, to obtain custody of Julia Gene. From the decree awarding custody to appellee is this appeal.

During the first year, or so, following the marriage, the mother, Nina Gene Janes, paid most of the household expenses until appellee secured employment in construction work which has, down to the present time, kept him away from home for the greater part of his time in various parts of the United States and some foreign countries. For several months prior to the child's birth, the mother had been in very poor health and under a doctor's care. It appears that appellee, who was in Detroit when the child was born, although knowing of his wife's condition, did not come to be with her at the time of the child's birth, but waited for six weeks thereafter before returning, his excuse being that his work required him to remain in Detroit. Following the child's birth, its mother's health continued so bad that she was unable to work regularly and moved to the home of her parents at appellee's insistence, although her mother was practically an invalid. Here they remained until in 1945. They moved to an apartment near the home of appellants and, without appellee's objections, appellants have taken care of the child, Julia Gene, as though she were their own and also assisted the mother until she died April 26, 1952.

Testimony of Nina Gene Janes, given at the divorce trial (and admitted in evidence in the present case), was in part, and in effect, that she was thirty-six years of age at the time, had taught school for fifteen years, but had to quit teaching in 1951 on account of poor health. She began teaching when Julia Gene was fifteen months old and her uncle and aunt (appellants) took care of her and have been like a father and mother to her. They treat her as though she were their own, took her to Sunday School and Church, and clothed her and helped support Nina Gene also. On one occasion, shortly before the divorce, appellee came to appellants' home, became enraged, and threatened to kill Nina Gene and the little girl, and since then this child appears to be afraid of her father and has expressed her dislike for him.

There was in evidence a portion of a will, executed by Nina Gene, which expressed the following request or desire: "In the event of my death, it is my desire that my beloved uncle, Wade Henry, and my beloved aunt, Mrs. Annie Jane Henry, of Atkins, Arkansas, have the care and custody of my beloved daughter, Julia Gene Janes, who was born on July 18, 1944, for the following reasons:

"Since the birth of my beloved daughter, Julia Gene Janes, my uncle and aunt named above had a great deal to do with looking after and caring for her, and in fact, they have helped clothe, feed and protect her. I have been in bad health, and they have cared for her in their own home practically ever since her birth. In addition thereto, I have taught school for a number of years, and they have had the care and charge of my beloved child from the time I would start to school in the morning until the time I would return in the afternoon, and this care upon their part has been with the absolute knowledge and consent of my former husband, Clarence Cecil Janes, and myself. They love my beloved daughter as if she were their own child and have cared for her in the same way."

There was other evidence from the child's aunt and schoolmates of the child's dislike and fear of her father.

Jane Ann Fewell (thirteen years old) so testified, in effect, and her sister, Glora Gene Fewell, (twelve years of age) testified that Julia Gene, while visiting her father, told her she did not like her daddy, that Mr. and Mrs. Henry were good to her and she loved them, was glad to start home, and "she wanted to come back home."

Appellants, Mr. and Mrs. Henry, are fifty-seven and fifty-five years of age respectively, and it appears undisputed that they are of good character, are able to, and have been furnishing a good home for the child. They are active church people and will give the child proper training. They have secured a substantial policy of insurance for her education and seem devoted to her. During the approximately eight years that they have been caring for Julia Gene, appellee has made no objections. He testified: "A. I didn't have anything to say about the child. They took care of the child. Q. They (appellants) took care of the child? A. And I had nothing to do with the child and I wasn't asked anything about her. Q. You didn't make any objections? A. No, sir. Q. Did you ever object to Mr. and Mrs. Henry looking after your child? During all of those eight years? A. I never objected."

Appellee (now forty-two years of age) has spent approximately sixteen months with this child during its lifetime. He now proposed to place this child in the care of a second wife. He is working in Bauxite and commuting back and forth from Little Rock. His present claim that he should have the custody of this child, we think, comes too late, after some eight years of apparent neglect and seeming indifference, bordering on abandonment, during which time he has allowed appellants to take his place, assume his duties, and do for Julia Gene what, he, as a father, should have done, thus allowing strong ties of love and affection to be developed in the hearts of appellants, as well as the child's.

Without attempting to detail the evidence in this voluminous record, it suffices to say that, after reviewing it, we have concluded that the findings of the Chancellor are against the preponderance of the testimony

and that the decree should be reversed, and the custody of this little girl awarded to appellants.

We are primarily concerned here with the best interests of the little girl and in reaching a solution of this difficult problem, we are not without well defined rules of law to guide us, running through many of our decisions.

We said in *Massey* v. *Flinn,* 198 Ark. 279, 128 S. W. 2d 1008: ''We recognize the general rule that ordinarily the parent of the child is its natural guardian and is entitled to its care and custody, however, this is not always true. There are exceptions. Of prime concern and the controlling factor is the best interest of the child. . . . 'The law recognizes the preferential rights of parents to their children over relatives and strangers, and where not detrimental to the welfare of the children, they are paramount, and will be respected, unless special circumstances demand that such rights be ignored. . . . The courts will not always, however, award the custody of an infant to the father, but, in the exercise of a sound discretion, will look into the peculiar circumstances of the case, and act as the welfare of the child appears to require considering primarily three things: (1) Respect for parental affection, (2) Interest of humanity generally, (3) The infant's own best interest.' . . .

'' 'Minors are the wards of chancery courts, and it is the duty of such courts to make any orders that would properly safeguard their rights. This is a *habeas corpus* proceeding, and the court had the authority to grant the custody of the child to the aunt, provided it finds that the father had forfeited his rights thereto. Three parties are interested in the custody of minor children, the State, the parents, and the child itself. While the right of the father to the custody of his child is paramount, this is denied in many cases, and, regard being had for the welfare of the child, its custody has been placed elsewhere. . . . The permanent well-being of the child more than its present enjoyment is to be considered as of prime importance. No hard and fast rule can be laid

down on the subject, and each case must be governed to a large extent by its own particular facts.' . . .

"In *Verser* v. *Ford*, 37 Ark. 27, this court said: 'In this case the motherless infant was taken by the maternal grandmother with the father's assent, and tenderly guarded through all the perils of infancy. There has been all of a mother's care, and scarcely less than a mother's affection. The child is yet scarcely three years of age, delicate in health; she is in a safe asylum, surrounded by those who may be trusted to guard her anxiously against pernicious influences, and to do the best to instill into her mind such principles as will promote her future usefulness and happiness. They, too, plead the full strength of natural affection.

" 'The infant needs female care and guidance of that patient, ever-watchful nature which is better insured by the natural affection of a grandmother than by the inexperienced efforts of a father or the sense of duty of the second wife.' " See, also, *Tucker* v. *Tucker*, 207 Ark. 359, 180 S. W. 2d 571, and the recent case of *Griffen* v. *Newcom*, 219 Ark. 146, 240 S. W. 2d 648.

Accordingly, the decree is reversed for further proceedings consistent with this opinion.

Justices GEORGE ROSE SMITH and WARD dissent.