Charles CROSSER and Karen Crosser *v.* James HENSON

04-198                                          187 S.W.3d 848

Supreme Court of Arkansas
Opinion delivered June 10, 2004

*Barret & Deacon, A Professional Association*, by: *D.P. Marshall Jr.* and *Leigh M. Chiles*; and *Halsey & Thyer*, by: *Barbara Halsey*, for appellants.

*Kimberly Johnson, P.A.*, by: *Kimberly Johnson*, for appellee.

ROBERT L. BROWN, Justice. Appellants Charles and Karen Crosser appeal from the circuit court's order, which declared a previous guardianship order void *ab initio*, granted Appellee James Henson's motion for termination of guardianship, denied the Crossers' petition for adoption, and awarded James custody of his six-year-old daughter, Cecileigh Aline Henson. The Crossers argue the following point on appeal: the circuit court erred by giving the natural-parent preference dispositive weight and by refusing to decide the case based on the best interest of the child. We agree with the Crossers, and we reverse and remand for further proceedings using the correct standard.

James and Melissa Henson were married in January 1995. On February 18, 1997, Cecileigh Aline Henson was born to the Hensons in Cleveland, Mississippi. In 1997, Melissa left James. Melissa's mother and stepfather are the Crossers, and they reside in Jonesboro. They offered to help James care for Cecileigh, because he worked all day. In late July 1997, Karen Crosser met James in Marianna and took Cecileigh back to Jonesboro for the weekend to "give him a break." During a second weekend in August, Karen Crosser met James in Walls, Mississippi, and took Cecileigh for the weekend. On Sunday, August 17, 1997, the Crossers and James agreed that the Crossers would keep Cecileigh. At that time, the Crossers claim that they asserted physical custody over the child. Melissa moved to Jonesboro in September 1997 and stayed there for about two months.

On December 24, 1997, Henson signed a waiver of notice and consent to granting a guardianship over Cecileigh to the Crossers. On December 31, 1997, the Crossers filed two petitions for appointment of a guardian, one signed and one unsigned. In both petitions, the Crossers asserted that Cecileigh was nine months old and had been residing at the Crossers' residence in Jonesboro since August 1997. Petitioners proposed "the guardianship to continue until such time as either or both of the natural parents [were] able to provide a stable, safe and secure environment for the child, and during that time, the petitioners request authority to provide a home and care for the respondent, [Cecileigh,] with full authority to enroll her in schools, conserve and manage her assets, and attend to her physical and emotional needs." On January 12, 1998, Melissa filed her waiver of notice and consent to the guardianship.

Also, on January 12, 1998, the probate court filed its guardianship order, which appointed the Crossers as Cecileigh's

guardians. In that order, the court found that it had jurisdiction of the matter, because the Crossers and Cecileigh were domiciled in Craighead County; that the Crossers were qualified and suitable to act as guardians; and that it was in the best interest of Cecileigh that the Crossers be appointed guardians.

On April 17, 2001, James obtained a divorce from Melissa in Mississippi on grounds of desertion, and the Mississippi court granted James custody of Cecileigh. Three days later, James married Jennifer McIntyre, with whom he has now had three children. On February 21, 2003, James filed his motion to terminate the guardianship and requested that the court award him custody of Cecileigh. In his motion, he asserted that Cecileigh had not been a resident of Arkansas for more than six months when the court appointed the Crossers as her guardians; that there had been a material change in James's circumstances since January 12, 1998; and that it is in Cecileigh's best interest to reunite with her biological father.

On October 28, 2003, the Crossers filed a petition for adoption. In this petition, they alleged that James abandoned Cecileigh and that he failed to communicate with her or to provide care and support for her for over a year pursuant to Ark. Code Ann. § 9-9-207 (Repl. 2002). James answered, denied the allegations, and requested custody of his daughter. The Crossers next filed a petition for grandparents' visitation in the event that the court granted James's motion to terminate the guardianship.

On December 2-3, 2003, a hearing was held in circuit court to decide the various motions related to Cecileigh. At the hearing, James testified that his take home pay was $350 per week and that his rent, electricity, and gas were paid by his employer. Linda Jean Campbell, former director at the daycare center at First United Methodist Church in Jonesboro, testified that Cecileigh first started attending daycare when she was fifteen months old. Ms. Campbell testified that as Cecileigh advanced through the daycare program, the center would take special care to help Cecileigh make the transition, because it was hard for her to be with new teachers. Debbie Williams, Assistant Director at the First United Methodist Learning Center, testified that Cecileigh would test her limits from time to time while transitioning from one grade to the next and that she needed to be comforted when the class would go on field trips.

Also at the hearing, Ms. Dee Kernodle, a self-employed Licensed Professional Counselor, Registered Play Therapist, testified that she believed Cecileigh would need therapy if she left the

Crossers, because her trust would be broken. Ms. Kernodle predicted that Cecileigh would exhibit problems like anxiety, regression in her behavior, and acting out. Ms. Kernodle testified that she had only talked with Cecileigh about living with James for a few minutes. One of the Crossers' neighbors, Edie Hall, testified that Cecileigh is very self-confident about things but not as much with people and that Cecileigh holds back if she encounters someone new to her. Ms. Hall testified that she thought it would be "terrible" for Cecileigh to move from the Crossers' home to James's home.

At the end of the hearing, the circuit court made its ruling from the bench. The court first ruled that the 1998 guardianship order was void *ab initio* under the Uniform Child Custody Jurisdiction Act (UCCJA), Ark. Code Ann. §§ 9-13-201 — 9-13-227 (Repl. 1998), because Cecileigh was born in Mississippi and had not lived in Arkansas for more than six months prior to that time. The court then said:

> The State of Arkansas does not allow the Court to sit here and make a balancing scale and set up a scale here, and then hear testimony and put a weight over here for this testimony and some over here for this and come up with what's the right thing to do. The Court is given a preference by both statute and by Supreme Court decision, and that basically is between a parent and a third party, the legal preference for a custodian is the parent, unless the parent is incompetent or unfit. There has been no testimony given to this Court that is credible today that James Henson is incompetent or unfit. From everything it looks like he has gotten his act together, and he is doing well today, and this is based upon the <u>Lloyd versus Butts</u> case, and other cases, too, that have been decided by the Supreme Court and the Court of Appeals.

> In this matter, also, the Court does not take into consideration whether the child is going to be better off with one party versus another when it has to make a decision for the preference of the parent, better off meaning you can't just decide both sides temporally as to what their actual, whether they're of better moral or temporal character, or whatever, the Court cannot use that, only if the father or the mother is unfit, or is incompetent, and we don't have that proof here today.

The court granted the motion to terminate the guardianship and ordered a gradual change in the physical custody from the Crossers to James with the culmination date being August 1, 2004.

The circuit court then filed its order that denied the petition for adoption, granted the motion for termination of guardianship, granted custody of Cecileigh to James, provided visitation to the Crossers, and set out a scheduled transition of custody for Cecileigh. The court concluded that the January 12, 1998 order of guardianship was void *ab initio*, because the court lacked jurisdiction to hear the matter. This, according to the court, was due to the fact that Arkansas was not Cecileigh's home state for the required period of time, and no court in Mississippi, the birth state, had relinquished jurisdiction to the State of Arkansas.

The Crossers' principal argument on appeal is that this is a custody-modification case, and the circuit court erred by using the natural-parent preference standard rather than the best-interest-of-the-child standard. The Crossers maintain that the circuit court made three legal errors: (1) it erred in finding that the natural-parent preference prevented the court from deciding what is in the best interest of the child; (2) it erred in finding that the probate court lacked jurisdiction in 1998 to establish custody over Cecileigh, because the Crossers had significant contacts with Arkansas, and Cecileigh's natural parents had consented to Arkansas jurisdiction; and (3) it failed to make any findings showing such a change in Cecileigh's life circumstances to warrant a change in custody. Additionally, the Crossers argue that because James voluntarily relinquished custody of Cecileigh, the natural-parent preference is not the guiding principle, and there need not have been an initial determination of James's fitness as a parent.

James counters that the circuit court correctly found that this case was an initial custody determination and that under *Schuh v. Roberson*, 302 Ark. 305, 788 S.W.2d 740 (1990), and *Rayburn v. Rayburn*, 231 Ark. 745, 332 S.W.2d 230 (1960), the natural-parent preference prevails unless the parent was proven unfit, as distinguished from a modification-of-custody case like *Lloyd v. Butts*, 343 Ark. 620, 37 S.W.3d 603 (2001). James emphasizes that he was never determined to be unfit. In the alternative, if this is a custody-modification case, James responds that the Crossers erroneously rely on *Lloyd v. Butts, supra; Jones v. Strauser*, 266 Ark. 441, 585 S.W.2d 931 (1979); and *In re Guardianship of Markham*, 32 Ark. App. 46, 795 S.W.2d 931 (1990). As a final point, James contends that the Crossers failed to meet their burden of proving that the circuit judge's findings were clearly erroneous.

■ As an initial matter, we hold that the circuit court erred in concluding that the probate court in Jonesboro did not have

jurisdiction to decide the 1998 guardianship. The applicable UCCJA statute in 1998 read that an Arkansas court had jurisdiction to determine child custody if either of the following situations is met:

> (1) This state (i) is the home state of the child at the time of commencement of the proceeding[;] or

> (2) It is in the best interests of the child that a court of this state assume jurisdiction because (i) the child and his parents, or the child and at least one (1) contestant, have a significant connection with this state and (ii) there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships[.]

Ark. Code Ann. § 9-13-203(a) (Repl. 1998). It is clear to this court that the Crossers and Cecileigh had a significant connection with Arkansas in 1998, with both living in Jonesboro, and that there was substantial evidence concerning the child's care, even though Arkansas did not qualify as Cecileigh's home state at that time. These circumstances are sufficient for the Arkansas probate court to have had jurisdiction to establish the guardianship in 1998.

■ ■ We turn next to the standard employed by the circuit court in awarding custody of Cecileigh to James. The Crossers rely mainly on our case of *Lloyd v. Butts, supra,* and the court-of-appeals case of *In re Guardianship of Markham, supra.* In *Lloyd v. Butts,* this court was confronted with a situation where the biological mother and biological father of one child petitioned to modify the custody of her two children, which had been placed with the divorced husband who was the biological father of only one of the children. We said in that case that for custody-modification matters, the best interest of the child is the "polestar," and the biological-parent preference is not absolute:

> ... [A] judicial award of custody should not be modified unless it is shown that there are changed conditions that demonstrate that a modification of the decree is in the best interest of the child. ... The only other time a change is permissible is when there is a showing of facts affecting the best interest of the children that were either not presented to the chancellor or were not known by the chancellor at the time the original custody award was entered.

> ... [W]hether an initial proceeding or a modification proceeding, the polestar remains the best interest and welfare of the child.

... [W]hile there is a preference in custody cases to award a child to its biological parent, that preference is not absolute. Rather, of prime concern, and the controlling factor, is the best interest of the child.

343 Ark. at 624–25, 37 S.W.3d at 606 (internal citations omitted). This court affirmed the chancellor's denial of the biological parents' petition for modification, because they failed to show a material change in circumstances as related to the child. Before affirming, we referred to the contention that the original court that determined custody had found the biological parents unfit and that now the noncustodial parents were fit:

.... [A] change of circumstances of the *noncustodial* parent is not sufficient to justify modifying custody. Here, the Lloyds had the burden of showing that a material change of circumstances had occurred since the chancellor's initial award of custody of the children to Michael in May 1994. ... [T]he Lloyds failed to meet their burden of showing a material change in circumstances.

343 Ark. at 626, 37 S.W.3d at 607 (internal citations omitted). In sum, we held that the fact that a noncustodial parent was now fit did not constitute a sufficient change of circumstances to warrant a change in custody.

In *In re Guardianship of Markham, supra,* the court of appeals dealt with a case where the biological parents petitioned unsuccessfully under Ark. Code Ann. § 28-65-401(b)(3) (Supp. 1989), to terminate the guardianship of their child who was with the father's aunt and her husband. The court of appeals found that the parents, by consenting to the guardianship order, did not forfeit their parental rights, but that they bore the burden of showing that a termination would be in the best interest of their daughter. The court of appeals affirmed the probate court's denial of the termination petition after finding that there was sufficient evidence for a determination that it was in the best interest of the child to remain in the aunt's home.

There are other cases where we have determined that the best interest of the child is the overriding factor. *See Blunt v. Cartwright,* 342 Ark. 662, 30 S.W.3d 737 (2000) (maternal grandparents awarded guardianship of child over objection of putative father on basis it was in best interest of child); *Schuh v. Roberson, supra* (best interest of child is controlling factor in child-custody cases, though when attempting to deprive natural parent of cus-

tody, the court must prove parent unfit); *Jones v. Strauser, supra* (welfare of child is polestar in every child-custody case, and natural father, though he has a preference, had not met his burden to support taking custody of child from maternal grandmother); *Henry v. Janes*, 222 Ark. 89, 257 S.W.2d 285 (1953) (court determined that considering the best interest of the child, the natural-parent preference was overcome, and custody of the child should be changed from the father to the great-aunt and great-uncle).

We view this as a custody-modification case, since the Crossers clearly had custody of Cecileigh by virtue of the 1998 guardianship. It is apparent to this court that the focus of the hearing held before the circuit court on the various Cecileigh motions was to decide what was in Cecileigh's best interest. This is also evidenced by the circuit court's order shifting physical custody to James gradually over a period of time. Nevertheless, the circuit court's own comments belie the fact that it used the best interest of Cecileigh as the guiding standard. Again, the court's ruling is to the effect that it believed that the natural-parent preference was binding, and the court could not deviate from it. These are the court's words:

> The State of Arkansas does not allow the Court to sit here and make a balancing scale and set up a scale here, and then hear testimony and put a weight over here for this testimony and some over here for this and come up with what's the right thing to do. The Court is given a preference by both statute and by Supreme Court decision, and that basically is between a parent and a third party, the legal preference for a custodian is the parent, unless the parent is incompetent or unfit. . . .

> In this matter, also, the Court does not take into consideration whether the child is going to be better off with one party versus another when it has to make a decision for the preference of the parent[.]

The standard invoked by the circuit court is simply incorrect in light of our case law. Determining whether the child is to be better off with one party versus another is precisely what the court should decide. The natural-parent preference and the fitness of that parent are not the absolute determinants in custody-modification matters, as our case law makes clear.

We reverse the circuit court's order and remand this matter for reconsideration in light of the correct standard. *See Blivin v. Weber*, 354 Ark. 483, 126 S.W.3d 351 (2003).

Reversed and remanded.