Christina McNair CAMP  *v.*  Mickey McNAIR,
Caree Ogiela and Mark Ogiela, Husband and Wife

CA 05–321                                                    217 S.W.3d 155

Court of Appeals of Arkansas
Opinion delivered November 16, 2005

*White & Watson Law Office,* by: *Rick Watson* and *Karen Pope Greenaway,* for appellant.

No response.

A NDREE LAYTON ROAF, Judge. Christina McNair Camp appeals from the trial court's order granting appellees Caree and Mark Ogiela, the paternal grandparents, custody of her minor child. On appeal, she argues that the trial court erred by (1) permitting the Ogielas to intervene in the custody proceedings; and (2) awarding custody to the Ogielas when they failed to prove that she was unfit. We reverse and remand.

Christina and Mickey McNair were divorced on September 19, 2003. They have one daughter, Brianna McNair, born May 8, 2003. Following a hearing held on February 20, 2004, the trial court awarded McNair, who was then living with his parents, the Ogielas, custody of Brianna and awarded Christina standard visitation. Christina was not given overnight visitation due to her cohabitation with a man to whom she was not married, but the trial court indicated that if Christina ceased cohabitating, then she could petition for overnight visitation. Christina's circumstance changed, and on July 1, 2004, the trial court lifted that restriction.

Thereafter, the parties agreed in writing that they would alternate custody every three months, and Christina took custody of Brianna on July 2, 2004. She then filed a petition for modification of the custody order on July 26, 2004. An argument ensued regarding Christina's pursuit of custody, and on August 18, 2004, McNair went to Christina's home and demanded that Brianna be returned to his custody. The Springdale Police Department was present, and McNair was taken to jail. On that same day, Caree and Mark Ogiela, Brianna's paternal grandparents, went to Christina's home and took custody of Brianna. According to Christina, the Ogielas indicated that McNair might flee with Brianna, and convinced her to allow them to keep Brianna to prevent McNair from absconding. A few minutes later, the Ogielas served Christina with a petition to intervene in the instant custody proceedings, and they also filed a petition for modification of the custody order. Christina filed a petition for emergency custody, alleging that the Ogielas had refused to return Brianna to her custody and that it was in Brianna's best interest that the trial court modify the custody order and place Brianna in her custody. Christina also filed a response to the Ogielas's petition to intervene and requested that the petition be dismissed.

A hearing on the parties' motions to modify the February 2004 custody order was held on November 8, 2004. McNair admitted that he was no longer in a position to adequately care for and support Brianna and testified that he wanted his parents to have custody of Brianna. He alleged that Christina was continuing to cohabitate with a married man, Craig Sayer. He testified that he had observed Craig and his children at Christina's house, and that he understood from conversations that he had had with Christina that Craig was at her house regularly. McNair also testified that Christina had made it difficult for him to exercise visitation with Brianna and that when she did agree to visitation, she would take Brianna to his parents' house rather than permitting him to pick her up. He was unable to state whether Christina abused alcohol, and merely stated that he did not know. He later stated that his mother, Caree Ogiela, had told him that Christina had been drunk when she returned Brianna after exercising visitation.

Caree Ogiela testified that the Ogielas had taken care of Brianna since August 2004. She stated that, because McNair had indicated that he wanted them to have custody of Brianna, they have been responsible for facilitating visitation with Christina. Caree Ogiela testified that she had to take Brianna to the hospital

several times, once for an upper-respiratory infection. She later admitted that she and a co-worker smoke in an office that is attached to their home. Caree also stated that Brianna has suffered from diarrhea, diaper rash, and other ailments when returning from Christina's custody. She also testified that she had "caught" Christina cohabitating. There was testimony that Craig had been seen at Christina's house as late as 10:30 p.m. and as early at 6:30 a.m. She also stated that she was concerned about Christina's ability to care for Brianna and that, when Brianna was in Christina's care, she was in poor health and her appearance was poor. She stated that, when she visited Christina's home in July, it was hot in the home because Christina's air conditioner was not working; that the toilet was not working, and Christina indicated that she needed to get someone out to fix it; that there were fans on the floor, and Caree was concerned that small children might stick their fingers in the fans; that there were five or six adults and several children living in the home with Christina and Brianna; and that it appeared that two children were sleeping in Brianna's baby bed because there was a pillow at each end of the bed. She further alleged that Brianna had returned from visitation with a bite mark on her back and a handprint on her face, and that occasionally Christina had returned Brianna dirty. Caree also stated that, since this case began, she had done her own "private detective work" and has followed Christina to the liquor store. She admitted that she did not see what Christina purchased; however, she stated that she had smelled alcohol on Christina's breath.

Christina testified that in February, the time of the last court order, she, Craig, her brother, and sister-in-law lived in the same home. Since the February order, she moved to her own home. It is a two-bedroom home. One of the bedrooms is designated for Brianna, and it is decorated for her and there is a crib in that room. Christina denied that she and Craig were cohabitating at her new home, but admitted that Craig and his two daughters had lived with her for a short time. Craig, however, has not lived in her home since July, and his two daughters have not lived in her home since early August. She also testified that Craig had not spent nights at her home since the trial court lifted the overnight-visitation restriction and that he had never spent the night when Brianna was present in her home. She admitted that Craig has come to her house as early as 6:30 a.m.

Regarding the condition of her home, Christina submitted forty-one pictures taken on August 19, 2004, to show the condition of her home. She denied abusing alcohol but admitted that she consumes wine on occasion. During her testimony, Christina referenced the trial court's concern that she had a "history of alcohol problems." She testified that her last alcohol-related offense occurred four years ago and that she no longer consumes beer and never consumes "hard liquor." She testified that she has had steady employment, only missing a few weeks that year. She also discussed times where the Ogielas had denied her visitation with Brianna and denied that she or anyone in her home had abused Brianna. The testimony also showed that Christina had been voluntarily given increased visitation with her other child, Jared.

After the hearing, the trial court commented that, at the time of the February order, it had placed great weight on the fact that Christina admitted that she was cohabitating with a married man. Accordingly, the trial judge placed Brianna in McNair's custody. The trial court found that there had been a material change in circumstances because McNair had left his parents' home and was now himself cohabitating with a woman to whom he was not married. The trial court acknowledged McNair's preference that Brianna be placed with his parents but also acknowledged that, in July, the parties felt that circumstances had changed such that Christina should be given overnight visitation because she had "met the conditions of the previous visitation order and was no longer cohabitating."

Regarding the Ogielas' petition to intervene and to modify the custody order, the trial court specifically found that they had not proved that Christina was still cohabitating, nor had they proved that she was abusing alcohol in Brianna's presence. The court also found that there was insufficient evidence supporting the Ogielas's assertion that Brianna had been abused while in Christina's custody. He found that there were no pictures showing the alleged injuries (bite mark or handprint) or a doctor's report. The trial court found that there was insufficient evidence showing that Christina was responsible for these alleged injuries and that there was no medical evidence showing the existence of the injuries.

However, the trial court commented that Christina had not "stepped up to the plate." The trial judge pointed to the fact that, despite her testimony that she had steady employment, she was behind on her child-support payments. The trial court also dis-

cussed Christina's relationship with Craig, a married man; however, he reiterated that the Ogielas had not shown that the two were cohabitating. Consequently, the trial court found that it was not in Brianna's best interest to be placed in Christina's custody. The trial court's written order states:

> The Court specifically finds that an insufficient period of time has passed since this Court made findings regarding the relative fitness of Christina Camp to serve as primary caregiver and custodian of and for Brianna McNair for this Court to determine that her shortcomings have been overcome; that Christina Camp has failed to cure certain deficiencies found by the Court and set out in prior orders entered herein, and that Christina Camp has failed to assume full responsibility for and demonstrate skills and actions required to be and serve as the primary caregiver and custodian of Brianna McNair.

As a result, the trial court placed Brianna in the Ogielas's custody. It is from this order that Christina appeals.

The standard of review in child-custody appeals is well settled. We review the evidence de novo, but we will not reverse the findings of the court unless it is shown that they are clearly contrary to the preponderance of the evidence. *Dunham v. Doyle*, 84 Ark. App. 36, 129 S.W.3d 304 (2003). We also give special deference to the superior position of the trial court to evaluate and judge the credibility of the witnesses in child-custody cases. *Id.*; *Hamilton v. Barrett*, 337 Ark. 460, 989 S.W.2d 520 (1999). We know of no cases in which the superior position, ability, and opportunity of the trial court to observe the parties carry as great a weight as those involving children. *Watts v. Watts*, 17 Ark. App. 253, 707 S.W.2d 777 (1986). A finding is clearly against the preponderance of the evidence when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Hollinger v. Hollinger*, 65 Ark. App. 110, 986 S.W.2d 105 (1999).

For her first point on appeal, Christina argues that the trial court erred in permitting Caree and Mark Ogiela to intervene in the custody proceedings because they lacked standing. Christina did not make this argument below, and, in order to preserve an issue on appeal challenging a party's standing, the appellant must have raised the issue below. *See State v. Houpt*, 302

Ark. 188, 788 S.W.2d 239 (1990). Our court has stated many times that it will not consider arguments raised for the first time on appeal, and even constitutional arguments must be raised below. *See Rudd v. State*, 76 Ark. App. 121, 61 S.W.3d 885 (2001). In this case, Christina's response to the Ogielas's motion to intervene urged the trial court to dismiss the petition. However, in her response, she did not argue for dismissal based on lack of standing. Accordingly, this court cannot reach the merits of this argument on appeal. *See Houpt, supra.*

■ For her second point on appeal, Christina argues that the trial court erred in awarding the Ogielas custody of Brianna where they failed to prove the allegations in their petition for modification of custody that she was an unfit mother. The substantive law on this topic prefers a parent over a grandparent or other third person, unless the parent is proved to be incompetent or unfit. *See, e.g., Dunham, supra; Schuh v. Roberson*, 302 Ark. 305, 788 S.W.2d 740 (1990); *Stamps v. Rawlins*, 297 Ark. 370, 761 S.W.2d 933 (1988); *Jones v. Strauser*, 266 Ark. 441, 585 S.W.2d 931 (1979); *Payne v. Jones*, 242 Ark. 686, 415 S.W.2d 57 (1967); *Riley v. Vest*, 235 Ark. 192, 357 S.W.2d 497 (1962). While there is a preference in custody cases to award a child to its biological parent, that preference is not absolute. *Dunham, supra.* Rather, of prime concern, and the controlling factor, is the best interest of the child. *Id.* The rights of parents are not proprietary and are subject to their related duty to care for and protect the child; the law secures their preferential rights only as long as they discharge their obligations. *Id.*

■■ The supreme court in *Lloyd v. Butts*, 343 Ark. 620, 624, 37 S.W.3d 603, 606 (2001), quoting from *Holmes v. Coleman*, 195 Ark. 196, 111 S.W.2d 474 (1937), stated:

> Courts are very reluctant to take from the natural parents the custody of their child, and will not do so unless the parents have manifested such indifference to its welfare as indicates a lack of intention to discharge the duties imposed by the laws of nature and of the state to their offspring suitable to their station in life. When, however, the natural parents so far fail to discharge these obligations as to manifest an abandonment of the child and the renunciation of their duties to it, it then becomes the policy of the law to induce some good man or woman to take the waif into the bosom of their home[.]

Further, in *Dunham, supra*, this court stated, "The language is strong, requiring the manifestation of indifference to the welfare of the child or abandonment. *Dunham*, 84 Ark. App. at 47, 129 S.W.3d at 311-12. We also stated that the right of natural parents to the custody of their children as against all others is one of the highest of natural rights and that the State cannot interfere with this right simply to better the moral and temporal welfare of the child as against an unoffending parent. *Dunham, supra.*

Citing *Dunham, supra*, this court held that the evidence in *Moore v. Sipes*, 85 Ark. App. 15, 146 S.W.3d 903 (2004), did not support a finding that the appellant was an unfit parent. Our court stated, "This is not a situation in which appellant has engaged in egregious conduct that would call her fitness into question." *Id.* at 21, 146 S.W.3d at 908. The appellant had moved a great deal, and as a result, her children had attended a number of schools. *Id.* She also had not supervised the children very well, and as a result, the boys had skipped school and stayed out all night on one occasion. *Id.* The evidence, however, showed that the appellant was working and was concerned about the children and attempting to see to their welfare. *Id.* The *Moore* court contrasted the facts of the case before it with the facts of *Blunt v. Cartwright*, 342 Ark. 662, 30 S.W.3d 737 (2000), where the father had only been employed for one week, had never had custody of the child, had failed to support her, and had physically abused the child's late mother.

We are not unmindful of the supreme court's recent observations in *Crosser v. Henson*, 357 Ark. 635, 187 S.W.3d 848 (2004), that "determining whether the child is better off with one party versus another is precisely what the court should decide" and that the preference and fitness of the natural parent are "not the absolute determination" in custody matters. However, the Crossers had had custody of the child for nearly six years pursuant to a valid guardianship order during which time the appellee father had in essence abandoned the child. The supreme court noted that the trial court was faced with a custody-modification case, in which the best interest of the child should always be determined rather than simply whether the parent was unfit, and reversed and remanded the case, ordering that the trial court reconsider the matter in light of the correct standard. In the case before us, the trial court made no findings in regard to the Ogielas other than to state that they had "voluntarily undertaken and assumed the responsibility for the child . . . and have been serving in loco

parentis for said child," and that the best interests of the child required that she be placed in the custody of the Ogielas.

In this case, we find that the trial court's decision is clearly erroneous. The trial court did not find that Christina was unfit. In its written order, the trial court stated that insufficient time has passed to determine Christina's "relative fitness" and to determine whether she has overcome her "shortcomings." This statement does not amount to a finding that Christina is unfit.

■ Moreover, the evidence would not have supported a finding that Christina is unfit. The trial court specifically stated that custody was awarded to McNair at the February hearing because of Christina's cohabitation with a married man. At the November hearing, the trial court specifically found that the Ogielas failed to prove that Christina was continuing to cohabitate. The testimony at the hearing suggested that the trial court also had concerns about Christina's abuse of alcoholic beverages; however, the trial court also found that the Ogielas had failed to show that Christina was abusing alcohol in Brianna's presence. The trial court also found that there was insufficient evidence, medical or otherwise, supporting the allegation that Brianna was being physically abused while in Christina's care.

The trial judge's comments at the conclusion of the hearing make it clear that he was concerned about Christina's continued relationship with a married man and the fact that she was behind on her child support payments. However, this is not a situation in which Christina's conduct is so egregious as to deem her unfit. *See Moore, supra.* Our case law provides that a natural parent must demonstrate a manifest indifference to her child's well being — an indifference tantamount to abandonment. *See Lloyd, supra; see also Dunham, supra.* Indeed, abandonment by the appellee father is precisely what occurred in *Crosser, supra.* The facts of this case in no way support a finding that Christina demonstrated a manifest indifference to Brianna's welfare that rises to the level of abandonment. The facts do show that, after the Ogielas employed subterfuge to take Brianna in late August, Christina consistently attempted to exercise visitation and on one occasion contacted the local police department when the Ogielas refused to let her see her child. Christina at the time of the hearing was employed and residing in a two-bedroom home, where one of the rooms was designated for Brianna; it was nicely decorated and there was a crib in the room for her. Christina testified that the conditions in her

home that caused concern — the air conditioning unit and toilet — had been remedied. Christina also had ceased cohabitating with Craig as a demonstration that her relationship with her child was more important, and while Christina was behind on her child-support payments, the evidence showed that she was current on her obligation through July 2004, when McNair left Brianna with her. It is also telling that McNair agreed in writing to allow Christina overnight visitation and to allow her more visitation time due to her apparent efforts at improving her life and at becoming a more responsible parent. Christina was likewise given more visitation with her other child.

In sum, our long-established case law favors the natural parent over a grandparent, unless the natural parent is unfit. In this instance, the evidence simply does not support a finding that Christina is unfit or that the child would be "better off" with grandparents who had taken her from her mother by subterfuge some three months prior to the hearing in this case. Accordingly, this case is reversed and remanded with directions to the trial court to enter an order not inconsistent with this opinion. Outright reversal is not an appropriate remedy because the previous custody order had placed Brianna in McNair's custody. *See Dunham, supra.* McNair does not appeal from the trial court's order, and the trial court properly found that he was not a proper custodian where he voluntarily relinquished his custody of Brianna. *See id.*

Reversed and remanded.

GRIFFEN, J., agrees.

VAUGHT, J., concurs.

LARRY D. VAUGHT, Judge, concurring. I agree that the trial court should be reversed but write separately to clarify my view of the impact of *Crosser v. Henson,* 357 Ark. 635, 187 S.W.3d 848 (2004). As more fully set forth in my concurring opinion in *Coffee v. Zolliecoffer,* 93 Ark. App. 61 (2005), I believe that our supreme court has abrogated the parental preference in favor of a best interest analysis in which being a fit biological parent is only a factor to be considered, not a preference.

While the majority ably sets forth the reasons why the evidence does not support a finding of unfitness on the part of Christina Camp, that does not end the inquiry. The trial court made no findings of fitness or unfitness, and in fact, made no

findings at all to support its conclusion that it was in the child's best interest for custody to be placed with the Ogielas. The court's conclusion appears to be based only on findings that Christina had not demonstrated that she had the skills to be a primary caregiver and that the Ogielas had "assumed the responsibilities" for the care of the child. Both of these findings are clearly erroneous.

The Ogielas "assumed" responsibility by conning Christina into turning the child over to them — allegedly to protect the child from their own son. Christina complied with all of the court's directives, and she certainly did not abandon the child. The court also found no evidence that Christina was cohabiting or using drugs. Based on the evidence as set forth in the majority opinion, I have no trouble holding that the trial court's best interest conclusion is clearly erroneous — even in light of the *Crosser* decision.