2012 Ark. App. 304

**Tammie MARCELLUS, Appellant**

v.

**Dayna Manning MAYS, Appellee.**

**No. CA 11–1201.**

Court of Appeals of Arkansas.

May 2, 2012.

Troy Gaston, Walters & Gaston, Greenwood, for Appellant.

JOSEPHINE LINKER HART, Judge.

In this one-brief case, Tammie Marcellus (Marcellus) appeals from an order denying her petition to have her appointed guardian over her paternal grandson, L.M. On appeal, she argues that the trial court's denial of the guardianship petition was clearly against the preponderance of the evidence. We affirm.

Appellee Dayna Manning Mays (Mays) is the mother of L.M., born May 2, 2009. She is currently married to Thomas Mays. Mays has three other children, all under the age of six, who were fathered by Mays's ex-husband, Danny Lee. L.M.'s biological father, Mason G. Marcellus, by his own statement, impregnated Mays during a "one night stand." It is undisputed that the child suffers from various skin rashes and respiratory problems.

Initially, the relationship between Marcellus and Mays was cordial—Mays appreciated that Marcellus babysat L.M. while she worked. However, the relationship deteriorated. On June 14, 2010, Marcellus filed in the probate division of Scott County Circuit Court a petition styled, "PETITION FOR EMERGENCY APPOINTMENT OF A GUARDIAN." In it, Marcellus asserted that L.M. was "in an unsafe, unwholesome environment and is being medically neglected and physically abused." Marcellus further asserted that she "fears for the safety and well being" of L.M. Marcellus also successfully moved, ex parte, for custody. However, after a hearing, custody was returned to Mays.

At the hearing on Marcellus's guardianship petition, Marcellus testified that she had been in "constant contact" with thirteen-month-old L.M. since he was born. She claimed that in several months, she kept the child more days than Mays did. Marcellus asserted that when she would get L.M. "back" from Mays, the child was

"almost always sick." She introduced several photographs showing diaper rash and the presence of red pimple-like spots on the child's abdomen. She claimed that the blisters were diagnosed as a staph infection. Marcellus claimed that Mays asked her to lie to the doctor treating L.M. for his respiratory illnesses, to hide the fact that Mays had not been giving the child the prescribed treatments. She also claimed that Mays disregarded Dr. Louay Nassri's instructions to keep L.M. away from cigarette smoke and allowed her mother to smoke in the presence of the children. Marcellus also claimed that before she got an ex parte order giving her custody, L.M. routinely had diarrhea, but under her care, he had improved. Marcellus also claimed that in the time she had custody of the child, he had gained two pounds.

Marcellus further criticized Mays by noting that Mays had male guests overnight while L.M. was present. She asserted that one guest was a "Level I sex offender." Marcellus claimed that during L.M.'s lifetime, Mays's "average relationship" with the men in her life had lasted "about four weeks and five days." Marcellus also noted that two of Mays's children "had a sample of beer." Further, she claimed that Mays disciplined her children with a paddle; Mays's family let the children eat "dog treats"; Mays's father was a "convicted drug felon"; Mays lets the "other children" visit with their father then worries that he is "out drunk"; and Mays lets the children sleep on pallets on the floor. Marcellus also opined that L.M. was not being properly fed or hydrated.

A court-ordered psychological evaluation was performed by Dr. Donna M. Van Kirk and submitted into evidence. The report noted that Mays had suffered from postpartum depression after L.M.'s birth, which was apparently successfully treated with medication and counseling. It further stated that Mays's depression did not recur after the birth of her fourth child. The report also noted that some of the test results were called into question because of Mays's responses on the validity scale and in other questions which suggested that she was trying to portray herself in a much more positive light. Mays's "most likely diagnosis" is "Mixed Personality Disorder." This conclusion was based on "test-taking behavior that produced improbably positive results; Mays's denial of all symptoms of mental, emotional, social, and behavioral problems or distress; noncompliance with medical advice (her own and [L.M.'s] medications); poor judgment (brief marital relationships); unstable home life (four male co-parents in five years); and immaturity (poor family planning, poor choice of partners, etc.)."

April Revis, an Advanced Practical Nurse employed by the Scott County Hospital, testified that L.M. was a patient of hers whom she saw every couple of months. She stated that Mays's children were clean and only suffered from "routine chronic illnesses." She recalled that L.M. had chronic ear infections. Referring to the pictures that Marcellus introduced into evidence, Revis stated that the rashes could be staph infections or MRSA,[1] and that others were probably yeast infections. While she conceded that poor hygiene could cause a skin rash, she noted that antibiotics could also cause rashes.

Revis testified that when L.M. was born, Mays suffered from postpartum depression, but no longer suffered from it and posed no danger to herself or her children. According to Revis, she referred L.M. to Dr. Nassri for respiratory problems. She noted from her records that Mays had "sometimes" not filled prescriptions, but had corrected the problem after seeking

1.  This is an acronym for "Methicillin-resistant    Staphylococcus aureus."

Revis's opinion. Revis noted that she had seen L.M. "a lot" and that she was aware that the child had also been seen by Dr. Nassri and the emergency room "a lot." Nonetheless, Revis expressed no concern that L.M. was in imminent danger of harm if he remained with his mother. Revis stated that, as far as she could tell, Mays was taking good care of L.M., and she received a report from an immunologist who said that L.M. was "progressing" and outgrowing normal childhood illnesses.

Revis was questioned about the report issued by the court-appointed psychologist, Dr. Van Kirk. She agreed that the report suggested that Mays had "honesty problems." However, Revis stated that she never felt that Mays had been dishonest with her and had always "been compliant with me or my office." She also noted that L.M. had some problems with diarrhea, but stated that it could be caused by giving the child milk or by his antibiotics. Revis stated that Mays brings L.M. to his follow-up appointments, and she reiterated that she was not "concerned" over how Mays cared for her child.

Dr. Nassri testified that he diagnosed L.M. with "persistent bronchitis." He expressed concern with L.M.'s long-lasting skin rashes. Dr. Nassri suspected that the child might have a deficient immune system, but, of the four tests he administered, three were "normal" and one was "questionable." He further noted that successive tests of the bacteria in L.M.'s airways revealed different strains each time, which was not consistent with his mother failing to provide appropriate care, but suggestive of an immune deficiency. Dr. Nassri noted that Marcellus had complained to him that Mays was not giving L.M. his medicine, and he "fussed" at Mays about it. He noted that there was a time when Mays was "not compliant" with his treatment instructions, but over the last year, she had been "compliant."

Psychiatrist Dr. Gerald Stein testified that he had appeared as an expert witness in court between twenty-five and fifty times. He conducted a two-hour interview with Marcellus, a one-hour interview with Mays, and reviewed the medical records. He expressed concern with Mays's mental health. He noted that Mays had a "major depressive episode," that Dr. Van Kirk's concluded that Mays had a personality disorder, that Mays had answered her test questions in a misleading way, and that, in his one-hour interview with her, Mays was "very slick" about how she responded to questions to make her appear more psychologically healthy than she was. Dr. Stein also expressed concern about the thickness of L.M.'s medical records, which he concluded was because Mays was non-compliant with Dr. Nassri's prescribed treatment. He further concluded that despite Mays having significant problems, she was resistant to treatment.

Mays largely denied all of Marcellus's allegations. She stated that the children were adequately housed and fed. She noted that the Arkansas Department of Human Services had been sent to her house three times in the last year and that each time they failed to find any significant problems. Mays asserted that she was properly medicating her child. She acknowledged that L.M. had diaper rash, but she claimed that she properly treated it with Boudreaux's Butt Paste at every diaper change. Likewise, she acknowledged that in the past she had not given L.M. certain medications, but asserted that she long ago corrected that problem. She also denied being promiscuous.

Mays's mother, Michelle Harris, testified that Mays was an "excellent mother." She denied smoking in the presence of the children. Harris also denied giving her grandchildren dog treats, but recalled a single incident where one of the children

took a single bite out of a dog treat. She stated that she immediately took the rest of the treat from the child.

At the conclusion of the hearing, the trial court denied Marcellus's guardianship petition. It nonetheless awarded Marcellus extensive visitation. Marcellus timely filed a notice of appeal.

On appeal, Marcellus argues that the trial court erred in dismissing her guardianship petition. While she acknowledges the preference in the law for a natural parent, she asserts that, pursuant to *Crosser v. Henson,* 357 Ark. 635, 187 S.W.3d 848 (2004), "determining which party is the one with whom the child would be better off is 'precisely' what courts should decide." Marcellus contends that the trial court erred in refusing to appoint her guardian because Mays had been involved with "over nine men" since L.M. had been born and had given birth to a subsequent out-of-wedlock child.[2] Further, Marcellus asserts that there was "substantial proof" that Mays had neglected L.M.'s medical needs. Finally, she argues that Mays has an "established pattern of deceit" that is a "significant negative influence on the child." We find this argument unconvincing.

We review probate proceedings de novo, but we will not reverse a finding of fact by the circuit court unless it is clearly erroneous. *Munn v. Hudson,* 2011 Ark. App. 775, 2011 WL 6226117. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Id.* When reviewing the proceedings, we give due regard to the opportunity and superior position of the probate judge to determine the credibility of the witnesses. *Id.*

We note that *Crosser* was overruled by *Graham v. Matheny,* 2009 Ark. 481, 346 S.W.3d 273. In so doing, the supreme court acknowledged that it had erred in not following the dictates of the probate code. Significantly, with regard to the case-at-bar, the probate code clearly states that "The parents of an unmarried minor, or either of them, if qualified and, in the opinion of the court, suitable, shall be preferred over all others for appointment as guardian of the person." Ark.Code Ann. § 28–65–204(a) (Repl.2012). The trial court did not find that Mays was unfit, and we hold that the trial court did not err in failing to make this finding.

We acknowledge that Marcellus presented considerable evidence about Mays's shortcomings as a mother. However, this evidence was largely controverted by Mays and Harris. While it is not disputed that, at one time, Mays failed to give L.M. certain medications, Mays testified, apparently credibly, that she had rectified this problem. Her testimony was corroborated by Revis and Dr. Nassri. As noted previously, we defer to the trial court on issues of credibility. *Munn v. Hudson, supra.* Likewise, while we acknowledge that a parent's sexual relationships can have a significant effect on the children in the household, we note that, at the time of the final hearing, Mays was married, and there was no evidence presented to suggest that her marriage was not stable.

Finally, while we agree that providing false information to a doctor or other healthcare professional could have adverse, if not disastrous, consequences for a patient, there is no basis for us to conclude that the trial court failed to adequately consider and weigh the evidence of Mays's alleged deceptiveness. Both Dr. Nassri

2. The child that Marcellus refers to was fathered by her ex-husband, Danny Lee, but after she had divorced Lee.

and Revis noted a general improvement in L.M.'s health, conclusions that are inconsistent with Marcellus's allegations that these healthcare providers were being misled and that deception adversely affected the child's treatment.

Affirmed.

GRUBER and GLOVER, JJ., agree.