2009 Ark. 481

**Jena GRAHAM, Appellant,**

v.

**Darlene MATHENY, Appellee.**

No. 08–975.

Supreme Court of Arkansas.

Oct. 8, 2009.

Max M. Horner, Jr., Jacksonville, for appellant.

No response.

ROBERT L. BROWN, Associate Justice.

This appeal raises one point for our consideration: whether the circuit judge employed the right legal standard in this termination-of-guardianship case. We conclude that the judge did not, and we reverse and remand.

On August 5, 2004, appellant Jena Graham ("Graham"), gave birth to a son, C.M., while incarcerated in the Arkansas Department of Correction. On the same day, with the written consent of Graham and the baby's father, Gary Matheny, C.M.'s paternal grandmother, Della Darlene Matheny ("Matheny"), petitioned the circuit court for guardianship of C.M. Her petition was granted by court order, and letters of guardianship were issued on August 5, 2004.

On July 17, 2005, Graham was released from prison, and on October 25, 2006, she filed a petition to rescind the guardianship. Graham's petition asserted that she "is no longer incarcerated and has made vast improvements in her life and therefore desires to have her son returned to her care and custody." The petition further maintained that "a material change in circumstances has occurred which warrants a change in guardianship to be awarded back to [Graham]." On January 18, 2007, Matheny responded to the petition and denied that there had been a material change in circumstances as it pertained to C.M. She also asserted that it was not in

C.M.'s best interest to terminate the guardianship.[1]

The circuit judge held a hearing on Graham's petition on February 26, 2007.[2] At the hearing, the following witnesses testified: Matheny; Graham; Tommy Glanton, the Assistant Executive Director of Recovery Centers of Arkansas, Graham's employer; Sybil Ward, an employee of Jefferson Comprehensive Care Systems and co-founder of Wards of Serenity, a nonprofit agency that counsels recovering addicts; Jennifer Bryant, Director of Keeping the Faith, a battered women's shelter, and Graham's best friend; and Brenda Bryant, Graham's mother.

Because the only issue before this court is the legal standard to be used in termination-of-guardianship cases, we briefly summarize the hearing testimony. Matheny testified that Graham had not done anything since her release from prison to cause her any concern and that she believed C.M. should eventually be returned to Graham's custody. She also told the judge that she thought that because C.M. was so young, the guardianship should continue for the present time. Graham testified that she had been drug free following her release. She told the judge that she was employed full time and had a suitable house where C.M. would have his own room. The other witnesses testified that Graham appeared to have been rehabilitated after prison.

Following the testimony, the circuit judge and counsel for Graham and Matheny discussed the appropriate legal standard to use in guardianship-termination proceedings. According to Graham, the purpose of the guardianship was for Matheny to care for C.M. while she was incarcerated, and now the guardianship was no longer necessary. She contended that it was in C.M.'s best interest to be reunited with his mother. Matheny's counsel responded that, according to this court's precedent, it was Graham's burden to prove that it was in C.M.'s best interest to terminate the guardianship. She further claimed that Graham failed to plead that it was in C.M.'s best interest to terminate the guardianship in her original petition and likewise neglected to prove it during the hearing. Matheny's counsel then argued that the only change in circumstances Graham proved related to her life and not to the circumstances of C.M.'s life. The circuit judge concluded the hearing by asking the parties to brief the issue.

On May 2, 2007, the circuit judge entered an order in which he concluded that the guardianship would remain in effect and that Graham should have visitation. The judge specifically found that "Jena Graham appears to be rehabilitated" and that "Matheny's primary concern about rescinding her guardianship over [C.M.] is that Jena Graham needs to be more attentive to the child and spend more time with him." After citing case law, the judge held:

1. While the testimony is uncontroverted that Jena Graham has rehabilitated herself, the law provides that a change in Jena Graham's circumstances is not sufficient to modify custody and rescind this guardianship.

2. In order to rescind this guardianship, the Court must find that there has been a material change in the child's circumstances and that it would be in the best interests of [C.M.] In this case, the law works to separate the child from a natural mother who is fit to care for

---

1. Graham filed a motion for default judgment on December 21, 2006, but no ruling was obtained.

2. The circuit judge's order states that the hearing was held on January 26, 2007, but the court reporter's transcript listed the date as Monday, February 26, 2007.

her child. However, there has been no material change in circumstances in [C.M.'s] situation. Therefore, the guardianship will remain in effect.

A review hearing was set and, on November 11, 2007, the circuit judge heard additional testimony from Graham, essentially to the effect that circumstances had remained the same since the February hearing. Graham did tell the judge that she had missed two visitations in that time and that she was still employed full time and was not using drugs. On January 31, 2008, the judge entered a final, appealable order, denying Graham's motion to rescind the guardianship and setting a permanent visitation schedule for Graham.

Graham urges in her appeal to this court that she should not be required to show any change in circumstances in order to have her son returned to her custody other than the fact that she has been rehabilitated and is now a fit parent. She writes in her brief: "Where a mother voluntarily gives up custody while she puts her own life back together, for the best interest of the child, the law should only require that she must then come back into court and prove she has changed her life such that she is a proper and fit person, once again, to be a parent." The appellee, Matheny, did not file a brief in the instant appeal.

■■■ The standard of review in probate proceedings, which include guardianships, is well settled:

_We review probate proceedings de novo, but we will not reverse a finding of fact by the circuit court unless it is clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. When reviewing the proceedings, we give due regard to the opportunity and superior position of the probate judge to determine the credibility of the witnesses.

See, e.g., Smith v. Thomas, 373 Ark. 427, 431, 284 S.W.3d 476, 479 (2008) (citing Devine v. Martens, 371 Ark. 60, 65, 263 S.W.3d 515 (2007)). It is also axiomatic that this court does not give the same deference to the circuit judge with respect to matters of law. See, e.g., Freeman v. Rushton, 360 Ark. 445, 449, 202 S.W.3d 485, 487 (2005).

We begin our analysis by noting that all guardianship proceedings in Arkansas are governed by statute. See Ark.Code Ann. §§ 28-65-101 to -603 (Repl.2004 & Supp. 2007). According to the statutes, a guardian is "one appointed by a court to have the care and custody of the person or of the estate, or of both, of an incapacitated person." Id. § 28-65-101(3) (Supp.2007). The Arkansas General Assembly made clear that, in the case of original guardianship actions with respect to children, natural parents enjoy a preference in the law. Id. § 28-65-204(a). Nevertheless, this court has also long held that "any inclination to appoint a parent or relative [as guardian] must be subservient to the principle that the child's interest is of paramount consideration." See, e.g., Smith, 373 Ark. at 432, 284 S.W.3d at 479 (quoting Blunt v. Cartwright, 342 Ark. 662, 669, 30 S.W.3d 737, 741 (2000)).

Once a guardianship has been created, section 28-65-401 of the Arkansas Code establishes the process for terminating that guardianship. That section provides:

(b) A guardianship may be terminated by court order after such notice as the court may require:

_(1) (A) If the guardianship was solely because of the ward's minority, and either the ward attains his or her majority or the disability of minority of the ward is removed for all purposes by a court of competent jurisdiction.

(B) However, if the court finds upon a proper showing by substantial compe-

tent evidence that it is in the best interest of the ward that the guardianship be continued after the ward reaches majority, the court may order the guardianship to continue until such time as it may be terminated by order of the court;

(2) If the ward becomes a nonresident of this state; or

(3) If, for any other reason, the guardianship is no longer necessary or for the best interest of the ward.

*Id.* § 28–65–401(b). In addition to this statutory language, this court has said that we "equate a petition to terminate a guardianship to a change of child custody among natural parents." *See Smith,* 373 Ark. at 432, 284 S.W.3d at 479; *see also Crosser v. Henson,* 357 Ark. 635, 643, 187 S.W.3d 848, 853 (2004).

In change-of-custody cases, this court has adopted a material-change-of-circumstances standard, which places the burden on the noncustodial parent to prove "changed conditions that demonstrate that a modification of the [custody] decree is in the best interest of the child." *See, e.g., Lloyd v. Butts,* 343 Ark. 620, 624, 37 S.W.3d 603, 606 (2001). However, in both change-of-custody and termination-of-guardianship cases, this court has reiterated that "the polestar remains the best interest and welfare of the child." *Id.; Smith,* 373 Ark. at 433, 284 S.W.3d at 480 ("[I]n both custody and guardianship situations, the child's best interest is of paramount consideration. . . .").

The pivotal issue in this case is whether the circuit judge properly applied the material-change-of-circumstances test to Graham's termination-of-guardianship petition instead of the statutory standard set forth under section 28–65–401(b)(3) that (1) the guardianship is no longer necessary, or (2) termination is in the best interest of the child. We conclude that this was error.

We turn then to an analysis of our case law. In 1979, this court decided a change-of-custody case, *Jones v. Strauser,* 266 Ark. 441, 585 S.W.2d 931 (1979). In *Strauser,* the appellant, Jones, and his wife divorced and agreed that their minor daughter should be placed in the custody of her maternal grandparents, the Strausers, and the Strausers were awarded custody of the child. The year after the custody order was entered, Mr. Strauser died, and Jones petitioned the court to modify the custody decree and award custody of the child to him. Jones urged that Mr. Strauser's death was a change in circumstances and that it was in his daughter's best interest for him to be awarded custody. Jones specifically stressed that the law awarded him a preference, as the natural parent, over Mrs. Strauser. The trial judge found that it was in the best interest of the child to remain with her grandmother and denied Jones's petition.

This court affirmed and stressed that the best interest of the child was "the polestar in every child-custody case." *Id.* at 443, 585 S.W.2d at 932. We then added that "[o]rdinarily it is true that, as between a parent and a grandparent, the law awards custody to the parent unless he is incompetent or unfit to have custody of the child." *Id.* We also found that while Jones's consent to the original custody order did not cause him to forfeit his parental preference forever, "its effect was so diminished that he bore the burden of showing a change in circumstances subsequent to that award which required or justified a change in the custody when considered from the standpoint of the child." *Id.* We held that the judge's finding that it was in the best interest of the child to remain in the custody of Mrs. Strauser was not clearly against the preponderance of the evidence.

In 1990, the Arkansas Court of Appeals relied on this court's reasoning in *Strauser* in a termination-of-guardianship case. *See In re Guardianship of Markham,* 32 Ark. App. 46, 795 S.W.2d 931 (1990). In *Markham,* Beth and Wayne Markham, biological parents of L.R., formally consented to have Wayne's aunt, Brenda Buck, and her husband, Randall, appointed as guardians of L.R. Approximately six months after the guardianship order was entered, the Markhams filed a petition to rescind the guardianship. During a hearing in the trial court, the Markhams testified that the Bucks were only keeping L.R. until they could "get back on their feet." The judge also heard testimony about the child's health and the circumstances surrounding her life. Following the hearing, the judge declined to terminate the guardianship.

The court of appeals affirmed and relied on the best-interest standard for the termination of a guardianship as set out in section 28–65–401(b)(3), as well as language from this court in *Strauser.* The court of appeals specifically held that the Markhams bore the burden "to show that a termination of the guardianship would be in [L.B.]'s best interest" and further held that "the language of Ark.Code Ann. § 28–65–401(b)(3) indicates that the termination of a guardianship for the best interest of the ward is a matter which lies within the probate court's discretion." *Id.* at 50, 795 S.W.2d at 933. The court of appeals concluded that there was evidence from which the trial judge could have determined it was in L.B.'s best interest to remain in the care of the Bucks.

Six years later, the court of appeals considered another termination-of-guardianship case with facts analogous to the instant case and seemed to clarify its holding in *Markham. See Hooks v. Pratte,* 53 Ark. App. 161, 920 S.W.2d 24 (1996). In *Hooks,* Ronya Pratte and Vaughan Hooks had a child, J.H., out of wedlock. In July 1992, Pratte left J.H. in the care of Hooks's mother, Sandra Goodier, while she obtained treatment for her addiction to cocaine. In October of the same year, Hooks and Pratte agreed to have Goodier appointed as J.H.'s guardian. In February 1994, Pratte petitioned the court to terminate the guardianship and argued that she consented to it in order to obtain treatment but understood that it would be voluntarily terminated when she was rehabilitated. The trial judge ordered that a home study and drug-screening test be performed on Pratte, and, following the completion of both, the court entered an order terminating the guardianship of J.H. The judge specifically found that "the circumstances that had led to the letters of guardianship being issued had changed to the extent that it would be in [J.H.]'s best interest to terminate the guardianship and reunite [him] with his mother." *Id.* at 163, 920 S.W.2d at 26.

Hooks and Goodier appealed, arguing that the trial judge erred in considering only whether the guardianship was still necessary under the statutory standard and that *Markham*'s holding required Pratte to prove that it was also in the best interest of J.H. to terminate the guardianship. The court of appeals acknowledged its holding in *Markham* but said that it "should not be interpreted as providing the only guideline a probate court can consider in terminating a guardianship." *Id.* at 165, 920 S.W.2d at 27. The court indicated that, according to section 28–65–401(b)(3), "a guardianship may be terminated if, for any reason, the guardianship is no longer necessary *or* for the best interest of the child." *Id.* (emphasis in original).

Next, in *Crosser v. Henson,* this court addressed the proper standard to use in termination-of-guardianship cases. 357 Ark. 635, 187 S.W.3d 848 (2004). In *Crosser,* James and Melissa Henson had a

child, C.H., born in Mississippi, where the Hensons lived. After C.H. was born, Melissa left James, and her mother and stepfather, Charles and Karen Crosser, offered to help James care for C.H. The Crossers resided in Jonesboro. Subsequently, both James and Melissa signed consent forms and agreed to the Crossers being appointed guardians of C.H. The Arkansas probate court then entered an order naming the Crossers as C.H.'s guardians.[3] In April 2001, James obtained a divorce from Melissa in Mississippi, and the Mississippi court granted him custody of C.H. In February 2003, James filed a motion to terminate the guardianship in Arkansas and also requested that the Arkansas court grant him custody of C.H. The Crossers responded by filing a petition to adopt C.H.

The trial judge ruled that the 1998 guardianship was void *ab initio* because that court lacked jurisdiction at that time under the Uniform Child Custody Jurisdiction Act. The judge then granted James's motion to terminate the guardianship and ruled from the bench that he could not consider the best interest of the child unless the natural parent was unfit. The judge also denied the Crossers' petition to adopt C.H. On appeal, this court first overruled the trial judge's finding that the 1998 court lacked jurisdiction to enter the original guardianship. We then proceeded to treat the case as a termination-of-guardianship case, as opposed to an original child-custody case, as James had urged, and analyzed whether the trial judge used the proper standard to determine whether to grant James's motion to terminate the guardianship.

The *Crosser* court first discussed *Lloyd v. Butts*, which, as already described, was a change-of-custody case. *Id.* at 641–42,

187 S.W.3d 848, 852 (citing *Lloyd*, 343 Ark. at 626, 37 S.W.3d at 607). In *Lloyd*, Michael Butts was awarded custody of two children when he divorced Kimberly Butts. One of the children was Michael's biological child, but the other was determined to be the biological child of another man, Derek Lloyd. In the divorce proceedings, the trial judge found that Kimberly and Derek were "nefarious and devious" and were "unfit and unsuitable for custody of the children." One year later, Kimberly and Derek, who had since married, petitioned the court to modify the custody order. The judge found that they were no longer unfit parents but also held that no material change in circumstances had occurred involving the children, and that it was in the children's best interest to remain in Michael's custody.

This court affirmed that decision in *Lloyd* and restated the rule that "a judicial award of custody should not be modified unless it is shown that there are changed conditions that demonstrate that a modification of the decree is in the best interest of the child." 343 Ark. at 624, 37 S.W.3d at 606. This court also explained that the rule operates to "promote stability and continuity in the life of the child, and to discourage the repeated relitigation of the same issues." *Id.* at 625, 37 S.W.3d at 606. Our opinion in *Lloyd* made clear that the party seeking a modification of custody has the burden to show a material change in circumstances and that "a change of circumstances of the noncustodial parent is not sufficient to justify modifying custody." *Id.* at 625–26, 37 S.W.3d at 607.

The *Crosser* court next turned to the *Markham* opinion and cited it for the proposition that, by consenting to an original guardianship order, the natural par-

---

**3.** This was a guardianship action because, despite the Henson's separation, they were still married.

ents bore the burden of showing that a termination would be in the best interest of the child. 357 Ark. at 642, 187 S.W.3d at 853. We also said that we viewed the case "as a custody-modification case, since the Crossers clearly had custody of [C.H.] by virtue of the 1998 guardianship." *Id.* at 643, 187 S.W.3d at 853.

Our specific holding in *Crosser,* however, was that the circuit judge erred because he believed that the natural-parent preference was binding and because he did not conduct a best-interest analysis relative to the child. *Id.* The *Crosser* opinion concluded with the following statement: "Determining whether the child is to be better off with one party versus another is precisely what the court should decide: The natural-parent preference and the fitness of that parent are not the absolute determinants in custody-modification matters, as our case law makes clear." *Id.* The opinion, though, did not mention the statutory standard for termination-of-guardianship cases enacted by the General Assembly in section 28–65–401(b)(3).

Most recently, this court decided *Smith v. Thomas,* another case in which the natural father petitioned to terminate a guardianship previously granted to the child's maternal grandparents. 373 Ark. 427, 284 S.W.3d 476 (2008). In *Smith,* Danny and Sandra Thomas were named guardians of their grandson, B.S., after his mother, the Thomases' daughter, died. B.S.'s father, Bryan Smith, also petitioned the court to be named B.S.'s guardian, but the judge found that it was in the child's best interest to be placed with his grandparents because Smith was a full-time college student and could not provide B.S. the stability he needed. Over two years after the original guardianship was created, Smith moved to terminate it. He contended that he had gotten married, was earning a stable income, and had maintained continuous contact with B.S. throughout the guardianship period. The circuit judge found that Smith was "qualified" but expressed concern about some other facts that arose in the hearing, which related to Smith's smoking, his failure to complete parenting classes, and a domestic-battery incident involving him. Ultimately, the circuit judge denied Smith's motion to terminate the guardianship because he found it was in B.S.'s best interest to remain in the custody of the Thomases.

On appeal, we affirmed and held that the judge's finding that it was in B.S.'s best interest to remain in the custody of the Thomases was not clearly erroneous and the natural-parent preference was subservient to the best interest of the child. *Id.* at 434, 284 S.W.3d at 481. Again, this court did not cite to the statutory standard set out in section 28–65–401(b)(3).

Graham, finally, directs this court to our decision in *Devine v. Martens* that "it is not in a child's best interest to take custody from a natural parent who has rectified all issues related to his or her fitness, and grant custody to a third party, such as that child's grandparents." 371 Ark. 60, 74, 263 S.W.3d 515, 526 (2007). *Devine,* however, was not a termination-of-guardianship case. Rather, in *Devine,* the circuit court had entered an original guardianship in favor of the minor child's grandparents, after finding the biological mother to be unfit. This court's holding in that case was that "the circuit court clearly erred in finding Devine to be an unfit mother and removing [the child] from her care." *Id.* at 72, 263 S.W.3d at 524. *Devine* does not support Graham's position in the instant appeal because it did not involve the proper legal standard to be applied in a termination-of-guardianship matter.

Because of the law set out above and by the trial court in the instant case, we conclude that there is confusion regarding the

standard to be used in termination-of-guardianship cases. We take this opportunity to clarify the law on this point.

■ First, it is clear to this court that the standard to be applied in termination-of-guardianship cases has been fixed by the General Assembly in section 28–65–401(b)(3), and that standard is (1) whether the guardianship is no longer necessary, or (2) whether termination is in the best interest of the ward. The statutory standard is crafted in the disjunctive and is applicable to terminations involving wards who are adults and wards who are children.

■ Second, when a guardianship has been established for a child, and a termination is sought, the court must first focus on whether, under current facts, the guardianship is still necessary. That, of course, is the first statutory standard.

■ Third, even if significant facts have changed relevant to the guardianship, such as Jena Graham's release from prison and her rehabilitation in the instant case, that does not automatically decide the issue of whether the guardianship of a child is still necessary under the first statutory standard. What is in the best interest of the child must always be examined under the first standard to determine whether the guardianship should be terminated. Best interest of the child is the paramount consideration in termination cases, as we said in *Crosser* and *Smith*.

■ Fourth, unlike an original guardianship action, when the guardianship of a child has been in effect for a period of time, the stability of the child's environment and how well the child is functioning in that environment become critical factors, in addition to other factors, in deciding the child's best interest under the statute.

■ Fifth, a change-of-custody analysis using the material-change-of-circumstances standard should not be done in termination-of-guardianship cases. Again, the proper standard has been fixed by the General Assembly in section 28–65–401(b)(3). This court acknowledges citing the material-change-of-circumstances standard in *Crosser* and *Smith*, which were both termination-of-guardianship cases. But, again, using this change-of-custody analysis has led to confusion, as evidenced by the instant case where the circuit judge referenced the best interest of the child but concluded that changed circumstances for only the non-custodial parent precluded him from terminating the guardianship.

■ We hold, therefore, that analyzing this case under the change-of-circumstances standard as if the case were a child-custody matter is the wrong analysis to be performed by the circuit judge in this termination case and that the proper analysis should be done under the standard set out in section 28–65–401(b)(3). We reverse the order denying Graham's petition to terminate the guardianship and remand for further proceedings using the statutory standard.

Reversed and remanded.

HANNAH, C.J., and DANIELSON, J., concur.

JIM HANNAH, Chief Justice, concurring.

I concur in the majority's decision that this case should be reversed and remanded. I agree with the majority that the standard to be applied in termination-of-guardianship cases is fixed by the General Assembly in Arkansas Code Annotated section 28–65–401(b)(3) (Repl.2004). This section provides that a guardianship may be terminated by court order for several reasons, and relevant to the present case, "[i]f, for any other reason, the guardianship is no longer necessary or for the best interest of the ward." Ark.Code Ann.

§ 28–65–401(b)(3). This section provides in the disjunctive, that the guardianship may be terminated where it is no longer necessary, or where for some other reason it is no longer in the best interest of the ward that it continue. I also agree that termination of guardianships may not be analogized to change-of-custody cases and that a material-change-of-circumstances analysis is not applicable in guardianship cases.

I write separately to set out my analysis and state what I believe the circuit court should consider on remand. Darlene Matheny filed a petition in the circuit court seeking guardianship of C.M. C.M.'s mother Jena Graham was incarcerated, and his father Gary Matheny was unable to care for his son. The petition includes affidavits filed by Jena and Gary stating that a guardianship was necessary to protect the well being of C.M. Neither the petitions nor the affidavits reference termination.

While Jena's incarceration is mentioned in the petition, there is no attempt to limit the guardianship to the period of incarceration. Rather, the guardianship was declared necessary to provide C.M. with "care, residency and health insurance, which the petitioners cannot obtain without legal guardianship of the minor."

Pursuant to Arkansas Code Annotated section 28–65–105 (Repl.2004), a legal guardianship may be established by the circuit court where a guardianship is necessary to promote and protect the well being of a person.[1] The circuit court must now consider whether, in light of all the circumstances argued by the parties, if for any reason, the guardianship is no longer necessary or for some other reason it is no longer in the best interest of the ward that the guardianship continue.[2] The circuit court must determine when the purpose of the guardianship it established is no longer necessary.[3]

---

1. I note that pursuant to Arkansas Statutes Annotated section 57–114 (1948), a guardianship established because of incarceration of a parent terminated upon discharge from imprisonment unless the parent consented that it continue. However, this statute was repealed in 1949 when the current language now codified in section 28–65–401(b)(3) (Repl.2004) was adopted. However, the current Arkansas statutory scheme establishing guardianships over minors does not base guardianships on parental consent, and if they are to be statutorily terminable upon withdrawal of consent, the General Assembly would have to modify the existing statutes to so provide.

2. The parties have not raised or argued the question of whether the statutory scheme at issue violates constitutional and common law parental rights to the custody and control of children. See Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); Payne v. Jones, 242 Ark. 686, 415 S.W.2d 57 (1967); see also In re Guardianship of Williams, 254 Kan. 814, 869 P.2d 661, 667 (1994) (stating that judicial question of what is best for welfare of child never arises unless the parents are dead or declared unfit); In re Guardianship of Jeremiah T., 976 A.2d 955, 963 (Me. 2009) (holding that guardianship must be terminated unless guardian proves parent is unfit and continuation of guardianship is in best interest of minor). Further, the law establishes a preference for the natural parent and that preference must prevail unless it is established that the natural parent is unfit. Schuh v. Roberson, 302 Ark. 305, 306, 788 S.W.2d 740, 741 (1990).

3. I further note that the parties have not raised the issue or argued whether Graham, as a parent who consented to the guardianship, and who was never found unfit, may by withdrawal of consent establish that the guardianship must be terminated. See In re Guardianship of Mikrut, 175 Ariz. 544, 858 P.2d 689, 693 (Ariz.Ct.App.1993). My concern is the effect this decision will have, for example, on those called to active military duty who are required to establish a guardianship for their minor children. They may be quite shocked upon their return to discover that they must prove, not that they are back, but that termination of the guardianship is in the best interest of their child.

This court erred in *Crosser v. Henson,* 357 Ark. 635, 643, 187 S.W.3d 848, 853 (2004), in stating that we view a petition to terminate a guardianship "as a custody modification case."[4] A guardianship is not analogous to a custody modification. Guardianships are statutory and exist as defined by statute. Declaring termination of a guardianship analogous to custody modification errantly brought custody's material change of circumstances into the analysis. The error in *Crosser* led to similar errors in *Freeman v. Rushton,* 360 Ark. 445, 451, 202 S.W.3d 485, 488 (2005); and *Smith v. Thomas,* 373 Ark. 427, 433, 284 S.W.3d 476, 480 (2008). The court of appeals applies the best-interest-of-the-child standard to the termination of guardianships and expressly rejects material change in circumstances. *Jones v. Scott,* 92 Ark. App. 85, 93, 211 S.W.3d 46, 52 (2005) ("The trial court's reliance on the incorrect standard [material change in circumstances] was clearly erroneous."). However, neither this court nor the court of appeals has applied the proper standard on termination of a guardianship set out in the statute.[5] Upon remand, the circuit court should be ordered to determine whether if for any reason, the guardianship is no longer necessary or for some other reason it is no longer in the best interest of C.M. that the guardianship continue.

DANIELSON, J., joins.

4. In *Crosser,* the court relied on *Lloyd v. Butts,* 343 Ark. 620, 37 S.W.3d 603 (2001), which is a child-custody case rather than a guardianship case.

5. If material change of circumstances were to be the standard to be applied in termination-of-guardianship cases, the General Assembly would have to modify the statute to so provide.