2012 Ark. 245

**In the Matter of the GUARDIANSHIP OF S.H., a minor.**

**Tamera Troeskyn, Appellant**

v.

**Larry Herrington and Donna Herrington, Appellees.**

No. 11–1107.

Supreme Court of Arkansas.

May 31, 2012.

Teresa Wineland, Bonnie Joan Johnson, Williams & Anderson PLC, Little Rock, for Appellant.

Christina Boyd, Rufus T. Buie, III, Boyd & Buie, DeWitt, for Appellees.

JIM GUNTER, Justice.

Appellant Tamera Troeskyn appeals from an order of the Arkansas County Circuit Court denying her petition to terminate guardianship. She asserts on appeal that Ark.Code Ann. § 28–65–401 (Repl.2012), is unconstitutional as applied to her because it impinges on her fundamental liberty interest with respect to the care, control, and custody of her child; that the circuit court erred in denying the petition to terminate the guardianship; that the circuit court erred in granting a motion for psychological evaluation; and that the circuit court erred in admitting the records and reports of Lesa Doan and Dr. Steven Shapse into evidence. We assumed jurisdiction over this case as one involving issues of federal constitutional interpretation pursuant to Ark. Sup.Ct. R. 1–2(b)(3).

S.H. was born on July 1, 2005, to Scott Herrington and Tamera Troeskyn when Tamera lived in Minnesota. Thereafter, Tamera moved to Stuttgart, Arkansas, into a house with Scott next door to his parents, Donna and Larry Herrington. On August 19, 2008, the Herringtons filed a petition for guardianship of S.H., alleging that Tamera had been granted primary physical custody of S.H. on April 21, 2008, and that since that time, she had cohabitated with persons of the opposite sex; was unemployed; had moved her residence at least six times since January 1, 2008; had been kicked out of her current home at least once; had made statements indicating that she wanted to move back in with the Herringtons to provide stability for S.H.; and had recently been released from drug rehabilitation. An ex parte emergency temporary order of guardianship, indicating that Tamera had subjected the minor child to unstable living conditions by cohabitating with members of the opposite sex and had no visible means of supporting the child, was entered on August 20, 2008. On October 1, 2008, the court entered a temporary order of guardianship continuing the Herringtons' appointment as guardians of S.H. In the order, the court ordered unsupervised visitation for Tamera, supervised visitation for Scott, and mandatory drug testing for all parties to the action. The order noted that Tamera had recently married Tory Brickey.

At a hearing held on November 3, 2008, Tamera, who appeared pro se, consented to a permanent guardianship. Scott had waived appearance and consented to the guardianship previously. The court entered an order of guardianship on November 24, 2008, noting that Tamera had recently instituted divorce proceedings

against Tory Brickey and that she was again residing with Scott. The order stated that "by agreement of the parties" the guardianship of S.H. was granted to the Herringtons.

On June 25, 2010, Tamera filed a petition to terminate guardianship asserting that the guardianship was no longer necessary; that it was in S.H.'s best interest for the guardianship to be terminated; that Tamera was withdrawing any consent she had given to the establishment of the guardianship; that Tamera was a fit parent who was ready and willing to care for S.H.; that failure to terminate the guardianship would violate Tamera's common-law and constitutional rights to parent; that the guardianship statutes, specifically Ark.Code Ann. § 28–65–401, violated due process under the Fifth and Fourteenth Amendments to the United States Constitution and article 2, sections 8 and 21 of the Arkansas Constitution because the statutes do not require proper consideration of parental rights; and that because Tamera lived in Minnesota, termination of the guardianship was appropriate under Ark.Code Ann. § 28–65–401(b)(2).[1] The Herringtons responded to the petition to terminate, denying Tamera's claims, and filed a motion for psychological evaluations claiming that Tamera's psychological fitness and ability to parent were in question. The Herringtons asked the court to direct that all interested parties—Larry, Donna, Tamera, and Tamera's mother, Marcia Dally—submit to a psychological evaluation. Tamera objected to a psychological evaluation on the basis that she had not put her mental condition in controversy and that the Herringtons failed to show good cause to require an examination. Alternatively, Tamera asked the court to also require a mental evaluation of Scott Herrington and to allow Tamera to be evaluated near her home in Minnesota. The circuit court granted the motion for psychological evaluations.

The court held a hearing on the petition to terminate on April 8, 2011.[2] Tamera testified that she lived in Minnesota in a house that she shared with her sister and that she worked as a certified nursing assistant in an elder-care facility. She acknowledged that she had agreed to the guardianship in 2008 and admitted that at that time, her life was unstable, she was not working, she lived with the Herringtons, and she could not provide for S.H. financially. Tamera stated that when she consented to the guardianship, she believed that once she was stable, the guardianship would be terminated. Shortly after the permanent guardianship order was entered, Tamera moved back to Minnesota. On several occasions after the move, she visited S.H. in Arkansas and S.H. came to Minnesota to visit. However, after filing the petition to terminate the guardianship in August 2010, it became difficult to contact the Herringtons and schedule visitation. Tamera stated that since filing the petition, she was allowed to visit S.H. for about a week in February 2011. Tamera testified that she was not taking illegal drugs and had been voluntarily taking random drug tests in Minnesota.

Dr. Steven Shapse, who performed the psychological evaluation of Tamera, testified that he did not find any "red flags" with regard to her ability to be a fit par-

---

1. The Attorney General was notified of the attack on the constitutionality of the guardianship statute as required by Ark.Code Ann. § 16–111–106(b) but declined to intervene in the action.

2. The hearing was continued twice on behalf of the Herringtons over Tamera's objection.

ent. Dr. Shapse stated that he followed standard procedure in conducting the evaluation, including a comprehensive interview, a battery of standardized tests, a consultation with Tamera's current therapist, and a written report summarizing his evaluation. He testified that nothing in his findings suggested Tamera suffered from a mental health condition that would impair her ability to parent, and she did not suffer from a major mental illness. Additionally, there was no indication of poor impulse control and nothing to suggest she was not within a normal spectrum of well-functioning individuals.

Larry Herrington testified that he and his wife, Donna, had been S.H.'s guardians for nearly three years and that during that time, S.H. had been potty-trained, learned to read and write, and participated in dance classes. He testified that in his opinion, S.H. had bonded with him and his wife. He stated that Donna took S.H. to school most mornings and picked her up; Donna also took S.H. to the majority of her doctors' and counseling appointments. He testified that S.H. had been allowed to visit Tamera in Minnesota but that after the visits, S.H. was often distressed. Larry admitted that he was communicating less frequently with Tamera than he had been the year before and that he had purposefully decreased Tamera's visitation with S.H. because her counselor had recommended that she not travel to Minnesota. He felt that Tamera was inconsistent and not prepared to be a parent.

Lesa Doan, a licensed social worker, testified that she had provided counseling services for S.H. since March 5, 2010. Doan stated that when she first saw S.H., she was clingy and had trouble using the restroom. Over the past year, she had made progress and developed better self-esteem. However, Doan noted that she became concerned in April 2010 after S.H. returned from a Minnesota visit and had three difficult bowel incidents. Doan stated that S.H. became more clingy during this time. Doan recommended to Larry that Tamera's visits with S.H. take place in Arkansas and invited Tamera by letter to participate in S.H.'s therapy. Doan testified that additional setbacks included the manifestation of fear and threatening themes during S.H.'s play therapy. Doan stated that once S.H. started school in the fall of 2010, she became more independent and outgoing. In her opinion, Doan believed it to be in S.H.'s best interest to continue living with her guardians.

At the close of the testimony, the court took the matter under advisement. On July 13, 2011, the circuit court entered an order denying the petition to terminate the guardianship, finding that as applied in this case, Ark.Code Ann. § 28–65–401(b)(3) was not an unconstitutional violation of due process under either the federal or state constitution; that Tamera carried the burden of proof in the termination proceeding; that the guardianship of S.H. was still necessary; and that termination of the guardianship would not be in her best interest at this time. The court ordered that Tamera's visitation with S.H. be expanded as much as possible to create a stronger bond between mother and daughter, giving explicit instructions for such expansion, and that Tamera begin cooperating and participating in S.H.'s therapy sessions to whatever extent possible. Tamera filed a timely notice of appeal from the circuit court's order on August 9, 2011.

### I. *Constitutionality of Ark.Code Ann. § 28–65–401*

In her first point on appeal, Tamera asserts that, as applied to her, the guardianship termination statute, codified at Ark.Code Ann. § 28–65–401, is unconstitu-

tional because it impinges on her fundamental liberty interest with respect to the care, custody, and control of her child as articulated in *Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). Although Tamera contends that the statute violates due process as provided in both the federal and state constitutions, her argument focuses on the substantive due-process component of the |7Fourteenth Amendment, and she makes no Arkansas-specific argument. Tamera urges this court to hold that a parent does not surrender her fundamental liberty right in raising her child when she agrees to a guardianship and cites cases from several states as persuasive authority. Moreover, Tamera argues that public policy supports the protection of a fit, natural parent's constitutional liberty interest where that parent has agreed to a guardianship because it encourages a parent who may not be able to care for a child temporarily to seek what is in that child's best interest yet still enjoy the presumption when she petitions to terminate that guardianship. Tamera avers that because Ark.Code Ann. § 28–65–401 impinges on a fundamental right, it is subject to a strict-scrutiny analysis. Even assuming that the state has a compelling interest in protecting children, Tamera contends that such an interest can be adequately protected by placing the burden of proof on the opponent of termination.

In their response, the Herringtons assert that although a parent has a fundamental liberty interest during an initial guardianship proceeding, the parent does not enjoy the full privilege in a proceeding to terminate that guardianship. They maintain that the present case is distinguishable from *Troxel* because Tamera has relinquished custody to nonparent guardians. The Herringtons advocate a rational-basis standard for reviewing the constitutionality of the termination statute.

Further, they submit that a parent does not give up all constitutionally protected rights when consenting to a guardianship but that the parent does relinquish the parental presumption to control the care and custody of the child. The Herringtons cite *Graham v. Matheny,* 2009 Ark. 481, 346 S.W.3d 273, as the seminal Arkansas case on the issue of guardianship termination.

|8This case presents us with an issue of first impression with regard to the application of a parent's fundamental right to the care, control, and custody of his or her child within the framework of terminating a consensual guardianship. In Arkansas, all guardianship proceedings are governed by statute. Ark.Code Ann. §§ 28–65–101 to –604 (Repl.2012). Statutes are presumed constitutional, and the burden of proving otherwise is on the challenger of the statute. *Paschal v. State,* 2012 Ark. 127, at 8, 388 S.W.3d 429. If it is possible to construe a statute as constitutional, we must do so. *Id.* Because statutes are presumed to be framed in accordance with the Constitution, they should not be held invalid for repugnance thereto unless such conflict is clear and unmistakable. *Id.*

A guardian is "one appointed by a court to have the care and custody of the person or of the estate, or of both, of an incapacitated person." Ark.Code Ann. § 28–65–101(3) (Repl.2012). Before approving a guardian for a minor, the court must be satisfied that the guardianship is desirable to protect the interests of the minor and the person to be appointed guardian is qualified and suitable. Ark.Code Ann. § 28–65–210 (Repl.2012). The Arkansas General Assembly made clear that, in the case of original guardianship actions with respect to children, natural parents enjoy a preference in the law. Ark.Code Ann.

§ 28–65–204(a) (Repl.2012). Once established, a guardianship may be terminated by court order after notice as required by the court where the guardianship is no longer necessary or for the best interest of the ward. Ark.Code Ann. § 28–65–401(b)(3); *see also Graham v. Matheny,* 2009 Ark. 481, 346 S.W.3d 273 (clarifying the standard for courts in guardianship-termination proceedings).

In *Linder v. Linder,* we recognized a parent's fundamental liberty interest in the care, control, and custody of his or her child:

> The Fourteenth Amendment provides in relevant part that "[No state shall] deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. 14 § 1. This language has been interpreted over the years to have both a procedural and substantive component. The substantive component of the due process clause protects "those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg,* 521 U.S. 702, 720–21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997).
>
> One of the substantive components that has emerged from the Fourteenth Amendment's guarantee of due process of law is the liberty right of a parent to have and raise children. Several cases from the United States Supreme Court have dealt with the contours of this right as it has emerged over recent decades.

348 Ark. 322, 342, 72 S.W.3d 841, 851 (2002). The *Linder* court analyzed in depth the holding of the United States Supreme Court in *Troxel v. Granville,* wherein Justice O'Connor, speaking for four Justices in a plurality decision, summarized the Court's approach to governmental intrusions on the parent-child relationship:

> [T]he interest of parents in the care, custody, and control of their children ... is perhaps the oldest of the fundamental liberty interests recognized by this Court. More than 75 years ago, in *Meyer v. Nebraska,* 262 U.S. 390, 399, 401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), we held that the "liberty" protected by the Due Process Clause includes the right of parents to "establish a home and bring up children" and "to control the education of their own." Two years later, in *Pierce v. Society of Sisters,* 268 U.S. 510, 534–535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), we again held that the "liberty of parents and guardians" includes the right "to direct the upbringing and education of children under their control." We explained in *Pierce* that "[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Id.,* at 535, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070. We returned to the subject in *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), and again confirmed that there is a constitutional dimension to the right of parents to direct the upbringing of their children. "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Id.,* at 166, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645.
>
> In subsequent cases also, we have recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children.... In light of this extensive prec-

edent, it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.

*Troxel,* 530 U.S. at 65–66, 120 S.Ct. 2054. Moreover, the Supreme Court has recognized a parent's fundamental liberty interest even in cases where the child is not in the parent's custody. *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (a parent's "fundamental liberty interest . . . in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State"). It is " 'plain beyond the need for multiple citation' that a natural parent's 'desire for and right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right.' " *Id.* at 758–59, 102 S.Ct. 1388 (quoting *Lassiter v. Dep't of Social Servs.,* 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981)). In *Linder,* we adopted the *Troxel* plurality's ruling that a fit parent is presumed to be acting in a child's best interest. *Linder,* 348 Ark. at 350–52, 72 S.W.3d at 856–58; *see also Troxel,* 530 U.S. at 68, 120 S.Ct. 2054; *Parham v. J.R.,* 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979).

It is manifest that prior to the installation of the guardianship, Tamera, as S.H.'s natural mother who had not been deemed unfit, was entitled to the presumption that she was acting in the child's best interest. However, in this case, we must determine whether Tamera retained that fundamental right, and consequently, the presumption, when she consented to the guardianship and gave up custody of her child. Although we have never addressed the issue, the overwhelming majority of jurisdictions that have considered it have held that parents do not relinquish their fundamental liberty interest upon consenting to a guardianship. *See, e.g., In re D.I.S.,* 249 P.3d 775, 781–82 (Colo.2011) (concluding that where the parent had consented to the guardianship and now sought termination of it, the trial court was required to give "special weight" to the parent's decision to terminate); *In re Marriage of Dafoe,* 324 Ill.App.3d 254, 257 Ill.Dec. 761, 754 N.E.2d 419, 423–24 (2001) ("[I]n order to retain custody of a child [through a guardianship] over the superior right of the natural parent, a third party must demonstrate good cause or reason to overcome the presumption that a parent has a superior right to custody, and the third party must also show that it is in the child's best interests that the third party be awarded the care, custody, and control of the child."); *In re Guardianship of L.L. & J.L.,* 745 N.E.2d 222 (Ind.Ct.App.2001) (although based on the common-law doctrine of natural-parent preference, addressing constitutional implications in holding that the nonparent third party bears the burden of overcoming the natural-parent presumption by clear and cogent evidence); *In re Guardianship of Zachary Blair,* 662 N.W.2d 371 (Iowa Ct.App.2003) (upholding guardianship statutes as constitutional where they clearly establish preference for placement with natural parent, require a finding that the natural parent is unsuitable and not qualified prior to placement with a third party, and burden is always on nonparent to rebut the natural-parent presumption in initial guardianship appointment, modification, and termination); *In re Guardianship of Williams,* 254 Kan. 814, 869 P.2d 661 (1994) (relying on longtime common-law parental-preference doctrine to reverse denial of petition to terminate where natural parent had not

been deemed unfit); *In re Guardianship of Jeremiah T.*, 976 A.2d 955 (Me.2009) (recognizing a parent's constitutional right to care and custody of a child and requiring guardian to prove that natural parent is unfit and continuing guardianship is in the best interest of child); *In re Guardianship of D.J.*, 268 Neb. 239, 682 N.W.2d 238, 246 (2004) (holding that the best interest of the child is subject to the overriding principle that the relationship between parent and child is constitutionally protected); *In re Guardianship of Reena D.*, 163 N.H. 107, 35 A.3d 509 (2011) (based solely on state constitutional grounds, joining the majority of jurisdictions that *Troxel* rights apply where parent has consented to guardianship and placing burden of proof on guardians opposing termination); *In re Guardianship of Barros*, 701 N.W.2d 402 (N.D.2005) (concluding that because a natural parent has a fundamental right to custody, in a termination-of-guardianship proceeding, natural parent must prove by a preponderance that conditions requiring guardianship have been removed and then burden shifts to guardians to rebut presumption that parental custody is in the best interest of the child); *Boisvert v. Harrington*, 173 Vt. 285, 796 A.2d 1102 (2002) (recognizing that a parent's fundamental liberty interest requires that, in seeking to terminate a guardianship, the parent enjoy a presumption that his or her custody is in the child's best interest); *In re SRB–M*, 201 P.3d 1115 (Wyo. 2009) (concluding that constitutional protection of a parent's fundamental right to parent required a finding of parental unfitness in order to continue an established guardianship over a parent's objection). *But see In re Guardianship of L.V.*, 136 Cal.App.4th 481, 38 Cal.Rptr.3d 894 (2006) (holding that parents who are not participating in the day-to-day parenting of the minor are not entitled to constitu-

tional protections and that the test in termination proceedings is the best interest of the child); *In re Guardianship of M.R.S.*, 960 P.2d 357 (Okla.1998) (holding that where a natural parent seeks termination of a consensual guardianship, the presumption that termination is in the best interest of the child does not arise until the natural parent proves that the impediments that led to the guardianship have been removed and the court is satisfied that parent is fit and placement with the parent would not be harmful); *Grant v. Martin*, 757 So.2d 264 (Miss.2000) (holding that where a natural parent voluntarily relinquishes custody of a minor child, including guardianship, that parent forfeits the right to rely on the common-law presumption in favor of the natural parent); *Blair v. Badenhope*, 77 S.W.3d 137 (Tenn.2002) (holding that where a parent consents to awarding custody to a nonparent, the parent cannot later petition to change custody and claim a superior right as a natural parent).

Several of the states that have applied the *Troxel* presumption in proceedings to terminate a consensual guardianship have done so to serve important public-policy concerns. For instance, the Colorado Supreme Court explained,

> An important characteristic of a guardianship by parental consent is that parents have exercised their fundamental right to place their child in the custody of another for purposes of furthering the child's best interests. Failure to accord fit parents a presumption in favor of their decision to terminate a guardianship established by parental consent would penalize their initial decision to establish the guardianship and deter parents from invoking the guardianship laws as a means to care for the child while they address significant problems

that could impair the parent-child relationship or the child's development.

*In re D.I.S.,* 249 P.3d at 783 (internal citations omitted); *see also In re Guardianship of D.J.,* 682 N.W.2d at 246; *In re Guardianship of Reena D.,* 35 A.3d at 513–14. In *Devine v. Martens,* we expressed similar public-policy concerns. 371 Ark. 60, 74, 263 S.W.3d 515, 526 (2007) ("Just as the Arkansas Juvenile Code recognizes the efforts of parents in dependency-neglect actions to improve their homes and parenting skills, we should encourage and recognize such improvements by parents in guardianship actions.").

■■ We align ourselves with the majority view and hold that parents who have not been found unfit do not relinquish their fundamental liberty interest in raising their children by consenting to a guardianship and, thus, they are entitled to the *Troxel* presumption in a proceeding to terminate that guardianship. We resolve that this conclusion best comports with the constitutional right of parents, the temporal nature of guardianships, and public policy.

Next, we must turn to whether the termination statute at issue, as applied to Tamera, violated her fundamental right to the care, control, and custody of her child. A statute that infringes on a fundamental right is subject to strict-scrutiny review, and the statute cannot survive unless "a compelling state interest is advanced by the statute and the statute is the least restrictive method available to carry out [the] state interest." *Paschal,* 2012 Ark. 127, at 11–12, 388 S.W.3d at 437; *see also Linder,* 348 Ark. at 347–49, 72 S.W.3d at 855–56.

■ Although the circuit court stated in its order that it "firmly believe[s] it is both the natural and preferable order of things that a child should be raised by her parents," it made clear that in "the final analysis, [the child's] best interest must be the court's primary concern." It is evident from the court's findings that Tamera's status as natural parent was afforded no weight in the decision. Rather, the best interest of S.H. was the controlling factor in deciding whether to terminate the guardianship, and the circuit court specifically saddled Tamera with the burden of proving both that the guardianship was no longer necessary and that termination was in S.H.'s best interest. Tamera was required to carry this burden irrespective of the fact that her fitness had never been at issue and she had consented to the initial guardianship. As such, even assuming that the termination statute advanced a compelling interest of protecting children who had become stable in their guardianship environment, the statute was not applied to Tamera in the least restrictive available method where there was no weight given to her decision to terminate despite the presumption that she acts in her child's best interest.

■ Therefore, we hold that the application of Ark.Code Ann. § 28–65–401 in this instance violated Tamera's constitutional right. A natural parent who has not been deemed unfit is entitled to the presumption that he or she is acting in the child's best interest, even after consenting to a guardianship. Therefore, when a natural parent, who has not been deemed unfit and who has consented to a guardianship, files a petition to terminate that guardianship, that parent must put forth evidence that the guardianship is no longer necessary. Once the court is satisfied that the conditions necessitating the guardianship have been removed, the guardians shoulder the burden of rebutting the presumption that termination is in the child's best interest. We reverse and remand for the circuit court to address Tamera's petition in light of our holding.

## II. *Denial of Petition to Terminate Guardianship*

Because we hold that the guardianship-termination statute is unconstitutional as applied to Tamera, we need not address whether the circuit court clearly erred in finding that the guardianship was still necessary and that termination of it was not in S.H.'s best interest.

## III. *Psychological Evaluation*

Next, Tamera argues that the circuit court erred in granting the Herringtons' motion for psychological evaluation over her objection. Specifically, she asserts that the court's order was not authorized by Rule 35 of the Arkansas Rules of Civil Procedure because her mental condition was not in controversy and good cause was not shown. She relies principally on *Schlagenhauf v. Holder*, 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed.2d 152 (1964), the pivotal case construing the substantially similar Federal Rule of Civil Procedure 35(a).

A trial court has broad discretion in matters pertaining to discovery, and the exercise of that discretion will not be reversed by this court absent abuse of discretion that is prejudicial to the appealing party. *Loghry v. Rogers Group, Inc.*, 348 Ark. 369, 72 S.W.3d 499 (2002). To have abused its discretion, the circuit court must not only have made an error in its decision, but also must have acted improvidently, thoughtlessly, or without due consideration. *Chapman v. Ford Motor Co.*, 368 Ark. 328, 245 S.W.3d 123 (2006). Arkansas Rule of Civil Procedure 35 provides in relevant part:

(a) **Order for Examination.** When the mental or physical condition (including the blood group) of a party, or a person in the custody or under the legal control of a party, is in controversy, the court in which the action is pending may order the party to submit to a physical examination by a physician or a mental examination by a physician or a psychologist or to produce for the examination the person in his custody or legal control. The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions and scope of the examination and the person or persons by whom it is to be made.

Ark. R. Civ. P. 35(a) (2011). In *Schlagenhauf*, the Supreme Court explained,

Rule 35, therefore, requires discriminating application by the trial judge, who must decide, as an initial matter in every case, whether the party requesting a mental or physical examination or examinations has adequately demonstrated the existence of the Rule's requirements of "in controversy" and "good cause," which requirements, as the Court of Appeals in this case itself recognized, are necessarily related. This does not, of course, mean that the movant must prove his case on the merits in order to meet the requirements for a mental or physical examination. Nor does it mean that an evidentiary hearing is required in all cases. This may be necessary in some cases, but in other cases the showing could be made by affidavits or other usual methods short of a hearing. It does mean, though, that the movant must produce sufficient information, by whatever means, so that the district judge can fulfill his function mandated by the Rule.

379 U.S. at 118–19, 85 S.Ct. 234 (1964) (internal citations omitted).

In their motion, the Herringtons alleged that Tamera was unstable and that an examination was necessary to assess her mental and emotional capabilities prior to allowing the ward to be returned to her

custody. They submitted that Tamera had "exhibit[ed] behaviors which bring her psychological fitness, and ability to parent into question." As examples, they listed Tamera's relationship history, including a short six-month marriage, moving in and out of homes with men to whom she was not married, and her failure to communicate with S.H. for a six-week period. Although the allegations asserted in the motion are not especially demonstrative of mental instability, the circuit court found that psychological evaluations would be "beneficial to the court in reaching a decision on the ultimate issues in this case, i.e., the best interest of [S.H.]"

▮ In this instance, the circuit court failed to make the appropriate finding required by Rule 35 to warrant psychological evaluation—namely, that Tamera's mental condition was in controversy and that the Herringtons had shown good cause to warrant an invasive psychological examination. Rather, the circuit court simply found that having a psychological evaluation would be beneficial to the court. Although it may be argued that the mental health of parents or guardians is always an issue in cases involving the placement of children, we conclude that the circuit court abused its discretion where it did not apply the correct legal standard in evaluating the motion for psychological evaluation. As such, we reverse and remand on this issue.

## IV. *Evidentiary Issue*

▮ For her last point on appeal, Tamera maintains that the circuit court erred in admitting into evidence the written report of Lesa Doan summarizing her clinical involvement with S.H. and the written report of Dr. Shapse after his psychological examination of Tamera. She claims that those written documents constituted inadmissible hearsay, that the Herringtons provided no basis for an exception to the rule, and that the admitted evidence prejudiced her because the circuit court relied extensively on information from those reports in its written order denying the petition to terminate. The trial court has broad discretion in its evidentiary rulings; hence, the trial court's admission of evidence will not be disturbed on appeal unless there has been a manifest abuse of discretion. *S. Farm Bureau Cas. Ins. Co. v. Daggett*, 354 Ark. 112, 118 S.W.3d 525 (2003).

▮ As a threshold matter, we note that Tamera never formally objected to the introduction of Dr. Shapse's report. Although the circuit court noted in its order denying the petition to terminate that Tamera was reluctant to introduce the written report, she failed to lodge an objection when the report was offered into evidence. The record reflects that after Tamera called Dr. Shapse on rebuttal, the court inquired as to whether Tamera wanted to offer Dr. Shapse's written report into evidence, and the following colloquy occurred:

HERRINGTONS' ATTORNEY: Well, Your Honor, I was under the impression the Court had the psychologicals anyway. So, I mean they were forwarded here first, I assume. I know the ones on Mr. and Ms. Herrington were. I don't know about Ms. Troeskyn's.

TAMERA'S ATTORNEY: No, Your Honor. Obviously that's, you know, why we had Dr. Shapse here because the report itself, in my view, was hearsay.

COURT: Well, you don't want to put his report in?

TAMERA'S ATTORNEY: I think we covered in evidence—

COURT: Okay. All right.

TAMERA'S ATTORNEY: testimony the pertinent portion of the—

COURT: That's fine. When I go back and review my notes and exhibits it is often very helpful to the Court to be able to go and review a written report, assuming that the testimony that has been given concerning the report is the same thing that is in the written report. TAMERA'S ATTORNEY: If the Court—Your Honor, I will be glad to introduce— COURT: I am not going to tell you how— what to do—

. . . .

HERRINGTONS' ATTORNEY: I would move for the introduction of the psychological evaluation of Ms. Troeskyn, as Defendant's Exhibit Number Two for today. Does the Court have a copy or do I need to provide my copy?

. . . .

HERRINGTONS' ATTORNEY: Or do you have an extra copy? TAMERA'S ATTORNEY: I have one somewhere.

Thereafter, Dr. Shapse's written report was introduced into evidence.

■■■ Unless a party has no opportunity to object to a ruling of the court, an objection must be made at the time of the ruling, and the objecting party must make known to the court the action desired and the grounds of the objection. *Pearrow v. Feagin,* 300 Ark. 274, 778 S.W.2d 941 (1989). Here, although Tamera indicated it was her belief that the written report constituted hearsay, she failed to timely object when the report was offered into evidence. It is well settled that this court will not consider arguments raised for the first time on appeal. *Ford Motor Co. v. Ark. Motor Vehicle Comm'n,* 357 Ark. 125, 161 S.W.3d 788 (2004). Thus, we are precluded from reviewing the merits of her argument as to Dr. Shapse's report.

■■■ As to Lesa Doan's report, Tamera did make a timely and specific hearsay objection to its introduction. She claimed that because Doan was present to testify, her report was hearsay, that the Herringtons failed to articulate a proper exception to hearsay, and that it was error for the circuit court to allow the written report into evidence. While we agree that the report constituted hearsay, we hold that the admission of the report does not warrant reversal. Where hearsay evidence is improperly admitted, but the same evidence is properly admitted through another source, there is no reversible error. *Caldwell v. State,* 319 Ark. 243, 891 S.W.2d 42 (1995). We will not reverse a circuit court's admission of evidence in the absence of a showing of prejudice. *Aka v. Jefferson Hosp. Ass'n,* 344 Ark. 627, 42 S.W.3d 508 (2001). Here, Tamera was not prejudiced from the admission of the report itself because Doan testified at length during the hearing with regard to the contents of the report. As to any statements made by S.H. that were included in the report, those statements were not hearsay because they were not offered for the truth of the matters asserted but to show the basis for Doan's conclusions and recommendation. Therefore, we affirm on this point.

Reversed and remanded in part; affirmed in part.

CORBIN, BROWN, and GOODSON, JJ., concur in part and dissent in part.

COURTNEY HUDSON GOODSON, Justice, concurring in part and dissenting in part.

I fully support this court's decision that the guardianship termination statute is unconstitutional, as applied, for infringing upon Tamera's fundamental liberty interest in the care, custody, and control of

her child.[3] However, I disagree with that part of the majority's decision holding that a natural parent, who consents to a guardianship and has not been found unfit, bears any burden of proving in a termination proceeding that the guardianship is no longer necessary.

The right to care for and raise one's own child is a fundamental liberty interest that is protected by the Due Process Clause of the Fourteenth Amendment. *See Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (plurality opinion). In *Troxel,* the plurality struck down a "breathtakingly broad" Washington statute that allowed visitation by third parties based solely on a best-interest standard. *Id.* at 67, 120 S.Ct. 2054. The Court recognized that a fit parent is presumed to act and make decisions in the best interest of his or her children and held that courts must, therefore, "accord at least some special weight to the parent's own determination" when a parent's decision becomes subject to judicial review. *Id.* at 70, 120 S.Ct. 2054. The Court thus held that the statute, as applied, unconstitutionally infringed on the protected liberty interest of parents in the care, custody, and control of their children by permitting a court to disregard and override a fit parent's wishes based solely on the trial judge's personal view of the children's best interests. *Id.*

Building on these principles, today this court has joined a majority of jurisdictions to hold that parents who have not been deemed unfit do not forfeit their fundamental liberty interest in raising their children by consenting to a guardianship and that such parents are entitled to the *Troxel* presumption that their decision to reassert care, custody, and control of their children is in the children's best interest. In the present case, the termination statute was applied in an unconstitutional manner because Tamera's decision was not afforded the required special weight. With its instructions on remand, the majority gives Tamera the benefit of the presumption that she is acting in the child's best interest, but in the same breath, it disregards the special weight accorded a fit parent's decisions regarding her child by shouldering her with the burden of demonstrating that the guardianship is no longer necessary. In my view, the fundamental right at stake in this case must be protected by placing the entire burden of proof on those who seek to override the parent's presumptively valid decision. *See, e.g., In re Guardianship of Reena D.,* 163 N.H. 107, 35 A.3d 509 (2011). Not only must the guardians rebut the best-interest presumption, they must also prove that the guardianship remains necessary.

Moreover, the majority does not make clear what standard of proof Tamera is to bear. The opinion merely states that she "must put forth evidence" that the guardianship is no longer necessary. Is this a burden of going forward, or is it a burden of proof? Fundamental fairness necessarily requires the standard of proof to be calibrated in advance because the litigants and the fact-finder must know at the outset of a given proceeding how the risk of error will be allotted. *See Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). The majority should speak plainly on this point, as the parties and the circuit court should know and not be left guessing how to proceed.

For these reasons, I respectfully dissent.

CORBIN and BROWN, JJ., join.

---

**3.** I also agree with the majority's decisions regarding the psychological evaluation and the admission of the reports of Lesa Doan and Dr. Shapse.